IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DENNIS FUSARO,

*Plaintiff*,

v.

EMMET DAVITT, *et al.*
*Defendants*.

Civil Action No. ELH-17-3582

**MEMORANDUM OPINION**

This litigation involves a First Amendment challenge to Md. Code (2017 Repl. Vol., 2017 Supp.), § 3-506 of the Election Law Article ("E.L."). Under this statute, plaintiff Dennis Fusaro was denied access to a copy of Maryland's list of registered voters (the "List") because he does not live in Maryland and is not a Maryland registered voter. Fusaro sought such information for the 2014 Maryland gubernatorial primary and general election, and the 2016 presidential primary and general election. ECF 1-3 at 2.

Fusaro, a resident and registered voter of Virginia, has filed a complaint for declaratory and injunctive relief against a host of defendants in their official capacity: Emmet Davitt, the Maryland State Prosecutor; David McManus, Jr., Chair of the Maryland State Board of Elections (the "Board"); Patrick Hogan, Vice Chair of the Board; and Board Members Michael Cogan, Kelley Howells, and Gloria Lawlah.[1] *See* ECF 1 ("Complaint"). Fusaro appended several exhibits to his suit. *See* ECF 1-1 through ECF 1-4. As discussed, *infra*, the litigation is rooted in

---

[1] It appears that Lawlah is no longer a Member of the Board, and has been replaced by Malcolm Funn. *See* MARYLAND.GOV, STATE BOARD OF ELECTIONS (last visited August 5, 2018), http://elections.maryland.gov/about/index.html. Lawlah was a Board Member from 2016 through an unspecified date in 2018. *See* MARYLAND MANUAL ON-LINE, SECRETARIES, DEPARTMENT OF AGING, GLORIA GARY LAWLAH (last visited August 5, 2018), http://msa. maryland.gov/msa/mdmanual/10da/former/html/msa12153.html.

Davitt's unsuccessful prosecution of Fusaro in 2016 and 2017 for Maryland campaign violations. ECF 1.

In Count I, Fusaro avers that E.L. § 3-506(a)(1) is unconstitutional, both facially and as applied to him, because it states that only a " Maryland registered voter" may obtain a "copy of a list of [Maryland] registered voters . . . ." Therefore, it "selectively advantages some political speakers and disadvantages others." *Id.* ¶ 30. Fusaro contends that his "voice in Maryland politics may not be selectively silenced simply because he is not a registered voter" in Maryland. *Id.* ¶ 32.

In Count II, Fusaro claims that E.L. §§ 3-506(a)(1)(ii) and (c) create an unconstitutional restriction on speech because § 3-506(a)(1)(ii) requires that one who obtains the List cannot use it for "any . . . purpose not related to the electoral process," and E.L. § 3-506(c) provides: "A person who knowingly allows a list of registered voters, under the person's control, to be used for any purpose not related to the electoral process is guilty of a misdemeanor . . . ."[2] He claims that the provision prohibits the use of the List for "constitutionally-protected political speech . . . ." *Id.* ¶ 36. Moreover, he asserts that the content-based restrictions do not survive strict scrutiny. *Id.* ¶ 37. In addition, he alleges that the statutory phrase "related to the electoral process" is unconstitutionally vague. *Id.* ¶ 40. And, he alleges that E.L. § 3-506 "threatens Fusaro with prosecution for forbidden uses of the registered voter list that cannot be readily determined." *Id.*

---

[2] Plaintiff states in the Complaint: "'The First Amendment applies to action[s] at the state and local level through the Fourteenth Amendment.'" ECF 1, ¶ 29 (quoting *Snyder v. Phelps*, 580 F.3d 206, 214 (4th Cir. 2009), *aff'd*, 562 U.S 443 (2011)). However, defendants point out that "it is unclear whether Mr. Fusaro is attempting to allege a discrete equal protection claim." ECF 20-1 at 21. Fusaro clarified in his Opposition, ECF 21 at 14: "[T]his remains a simple First Amendment case[.]" According to Fusaro, "Equal Protection analysis . . . is inapplicable . . . ." *Id.* at 11.

Fusaro has also filed a Motion for Preliminary Injunction (ECF 17), supported by a memorandum of law (ECF 17-1) (collectively, the "PI Motion"). He asks the Court to enjoin McManus, Hogan, Cogan, Howells, and Lawlah from enforcing E.L. § 3-506(a)(1). *See* ECF 17 at 1. In addition, Fusaro asks the Court to enjoin all defendants from enforcing E.L. §§ 3-506(a)(1)(ii)(2) and (c). *Id.*

Defendants have filed a consolidated Motion to Dismiss the Complaint ("Motion" or "Motion to Dismiss") and Opposition to the PI Motion (ECF 20), supported by a memorandum of law (ECF 20-1) and exhibits. *See* ECF 20-2 and ECF 20-3. Plaintiff filed a consolidated Opposition to the Motion to Dismiss and Reply to the PI Motion (ECF 21), supported by an exhibit. *See* ECF 21-1. Defendants have replied as to the Motion to Dismiss. *See* ECF 22.[3]

No hearing is necessary to resolve the motions. *See* Local Rule 105.6. For the reasons that follow, I shall grant the Motion to Dismiss as to Count I of the Complaint. Therefore, I need not address the Motion with regard to Count II. And, because plaintiff cannot demonstrate a reasonably likelihood of success on the merits of his Complaint, I shall deny the PI Motion.

## I.     Factual and Procedural Background[4]

### A.

The Board oversees the administration of elections in Maryland, including compliance with E.L. § 3-506. *See* ECF 20-1 at 11; ECF 1. Of relevance here, the Board must provide

---

[3] Fusaro later filed correspondence "to inform the Court" of the Supreme Court's decision in *Minnesota Voters Alliance v. Mansky*, ___ U.S. ___, 138 S. Ct. 1876 (2018). It held unconstitutional a Minnesota law prohibiting one from wearing a political badge, button, or insignia inside a polling place on election day. *Id.*

[4] As discussed, *infra*, in the posture of this case, I must assume the truth of the facts alleged by Fusaro. And, I may consider exhibits appended to the suit and take judicial notice of public records, without converting the Motion to one for summary judgment.

reasonable access to "original voter registration applications" and "other voter registration records," E.L. § 3-505, without limitation to registered voters or specific purposes. Moreover, under Code of Maryland Regulations ("COMAR") 33.04.01.03A, "[a]ny person may request to inspect or copy a public record that is in the custody and control of the State Board or a local board [of election.]" Therefore, as the defendants observe, some of these records "may contain similar information to that found in the [L]ist." ECF 20-1 at 12.

Davitt is the Maryland State Prosecutor, a position established by Title 14 of the Criminal Procedure Article ("C.P.") of the Maryland Code (2008 Repl. Vol., 2017 Supp.). As State Prosecutor, Davitt is empowered to investigate and prosecute, *inter alia*, "a criminal offense under the State election laws" and "a violation of the State . . . perjury . . . laws related to" those "election laws . . . ." C.P. §§ 14-107(a)(1)(i), (a)(1)(v), 14-109(a). The Office of the State Prosecutor is an independent unit within the Office of the Attorney General. C.P. § 14-102(a)(2). He is appointed by the Governor, with the advice and consent of the Maryland Senate. C.P. § 14-102(c)(1).

As noted, Fusaro is a resident and registered voter in Virginia. ECF 1, ¶¶ 4, 9. But, he has "experience in Maryland politics." ECF 1, ¶ 16. In 2014, he worked as "campaign manager and consultant" for the successful campaign of Michael Peroutka, who was running for a seat on the Anne Arundel County Council. *See* ECF 1, ¶ 16; ECF 20-2 (Criminal Summons and Information forms of Dennis Fusaro, District Court for Anne Arundel County, dated April 13, 2016) at 5. In 2007 and 2008, Fusaro was National Field Director for Ron Paul for President. ECF 1, ¶ 17.

In his Complaint, Fusaro recounts that "[o]n February 21, 2017, [he] was convicted in a bench trial" in the District Court for Anne Arundel County "for failure to include a campaign

finance disclaimer on an automated phone call that cost under $100 to facilitate. . . . He was sentenced to 30 days in jail and a $1,000 fine." ECF 1, ¶ 1; *see State of Maryland v. Fusaro*, D-07-CR-16-000734 (D. Ct. Md. Anne Arundel Cty. Feb. 21, 2017). However, Fusaro noted a de novo appeal to the Circuit Court for Anne Arundel County. There, following a jury trial, he was acquitted on August 3, 2017. ECF 1, ¶ 1; *see State of Maryland v. Fusaro*, C-02-CR-17-000351 (Cir. Ct. for Anne Arundel Cty., Aug. 3, 2017).

The trials followed a two-count Criminal Information (ECF 20-2 at 5-7), issued by Davitt on April 13, 2016 (ECF 20-2 at 4), charging Fusaro with violations of Maryland election law. Specifically, Fusaro was charged with willfully causing the publication and distribution of campaign materials in Anne Arundel County (the "County") on October 31, 2014, in violation of E.L. §§ 13-602 and 13-401. *See* ECF 20-2 at 5-6. Fusaro was also charged with conspiracy to publish and distribute campaign materials in the County, between October 8, 2014 and November 20, 2014, in violation of E.L. §§ 13-602 and 13-401. *See* ECF 20-2 at 7.

As to Count I, the Criminal Information alleged that Fusaro, as Peroutka's campaign manager in 2014, caused the dissemination of more than 5,000 automated telephone calls about Peroutka's opponent, Patrick Armstrong, without the information required by E.L. § 13-401, such as the identity of the person authorizing and paying for the calls. *Id.* at 5-6.[5] As to Count II, Fusaro was charged with conspiracy to publish and distribute campaign material that did not comply with the requirements of E.L. § 13-402, because the automated telephone calls were alleged to falsely identify the person or organization responsible for the message. ECF 20-2 at 7.

The State Prosecutor allegedly traced the telephone calls to a prepaid cell phone that had been purchased by Fusaro. *See* ECF 20-2 at 6. According to the Criminal Information, the

---

[5] Defendants refer to the calls as "robo-calls." ECF 20-1 at 8.

robotic telephone calls contained the following message, *id.* at 5-6:

> Hello, what a great opportunity for the LGBT community. We have a true believer for our cause in Patrick Armstrong who's running for County Council in Anne Arundel County, Maryland. Call Patrick today and thank him for his bravery in coming out of the closet. Coming out of the closet and supporting the fairness to all Marylander's [sic] Act, the Maryland State Senate Bill 212, and supporting the rights for all transgenders. Transgenders can now openly and freely go into any bathroom of their choice based on their confused gender identity. Tell Patrick to continue to stand loud and proud in support for transgenders' equal rights. While our opponent argued that children could be at risk by sexual predators with this new law, we celebrate the rights of transgenders and what this does for equality for transgenders in Maryland. Call him today at [phone number redacted] and thank him for supporting the bathroom bill. Paid for and authorized by Marylander's [sic] for Transgenders.

E.L. § 13-602(a)(9) states, *id.*: "A person may not publish or distribute, or cause to be published or distributed, campaign material that violates § 13-401 of this title." E.L. § 13-401 requires, *inter alia*, that campaign materials indicate the name and identity of the person or entity responsible for publishing or distributing the campaign materials. *See* E.L. §§ 13-401(a)(1), (a)(2), (a)(3), (b).

On August 24, 2017, some three weeks after Fusaro's acquittal in the Circuit Court for Anne Arundel County, Fusaro submitted an Application for Voter Registration Data to the Board (ECF 1-2 at 2) ("Application"), requesting that the List be placed on a compact disc ("C.D.") and mailed to Fusaro at his Virginia Post Office address. *Id.*; *see also id.* at 3 (photocopies of two money orders, in the total amount of $128.00, to pay the required Application and C.D. fees). On the Application, Fusaro indicated that he is a Virginia resident. ECF 1-2 at 2.

The Application contained an oath, providing, in part, ECF 1-2 at 2: "Under penalty of perjury, I hereby declare, as required by Election Law Article, § 3-506, *Annotated Code of Maryland*, that **the list of registered voters for which I am applying is not intended to be used for commercial solicitation or for any other purpose not related to the electoral**

**process**. . . ." (Bold and italics in original).  Fusaro signed the Application.  *Id.*

Fusaro submitted as an exhibit to the suit a returned copy of the Application (ECF 1-3) ("Rejected Application"), dated August 28, 2017, which bears the word "REJECTED" and the initials "EWD."  Email correspondence between Fusaro and Erin W. Dennis, a Board employee, dated September 4, 2017 and September 6, 2017, indicates that the initials "EWD" on the Rejected Application are those of Ms. Dennis.  *See* ECF 1-4 (emails between Fusaro and Ms. Dennis).  In the email exchange, Ms. Dennis informed Fusaro that his Application "was rejected because [one] must be a Maryland resident and registered voter to request a copy of the [Maryland] voter registration list."  *Id.*

Fusaro explains that he wants the List in order "to share his story with Maryland citizens" concerning his prosecution and subsequent acquittal for the alleged violations of Maryland campaign finance law.  ECF 1, ¶ 2.  According to Fusaro, he wants to "express his frustration with the Maryland State Prosecutor and encourage Marylanders to echo his concern by encouraging Davitt to resign."  *Id.*  Therefore, Fusaro seeks to communicate with Maryland citizens "via U.S. Mail with letters addressed to certain Maryland registered voters, drawing [names and contact information] from" the List.  *Id.* ¶ 3.

Fusaro has submitted a copy of the document he seeks to mail to certain Maryland registered voters.  *See* ECF 1-1 (the "Letter").  The Letter states, in part, *id.*:

> One example of the failure to uphold the principles of both the U.S. and Maryland Constitutions can be found in the person of the Maryland State Prosecutor, a man named Emmett C. Davitt.

> Davitt was appointed to this office, and his term expired in 2016, but he has remained in that office in so-called "holdover" status. He continues to collect his taxpayer-funded salary and attack First Amendment free speech rights under the color of law.

> I experienced this censorship first hand. I was charged with violating state

campaign finance laws for a speech communication that cost under $100. Davitt wanted me to serve thirty (30) days in jail for speaking out. Thankfully, a jury of my peers found me not guilty in my second trial. Davitt's next target may not be so lucky.

As a Maryland government official, Davitt breaks the law by misusing his power to infringe on constitutionally-protected individual free speech rights. He acts under the "color of law" to violate the law and disobey the oath he swore to uphold and defend the U.S. and Maryland Constitutions against all enemies foreign and domestic. In fact, he himself has become an enemy of the Constitution and the rule of law.

Please call Davitt at . . . (toll free) or email him at . . . .

Ask him to do the right thing. Tell him to resign.

**B.**

As to Count I of the Complaint, Fusaro asserts that the Maryland registered voter requirement in E.L. § 3-506(a)(1) is unconstitutional under the First and Fourteenth Amendments. ECF 1 at 6. He asserts that "[b]y limiting access to the registered voter list to Maryland registered voters, E.L. § 3-506(a)(1) selectively advantages some political speakers," *i.e.*, Maryland registered voters, "and disadvantages others," *i.e.*, those who are not Maryland registered voters. ECF 1, ¶ 30. Although Fusaro acknowledges that he may acquire the same voter registration information from Maryland through other "means," he contends that those means are "more time-consuming and expensive." *Id.* ¶ 31.

In Count II, Fusaro alleges that "limiting the use of the List of Registered Voters to purposes 'related to the electoral process' in E.L. §[§] 3-506(a)(1), (c) is unconstitutional under the First and Fourteenth Amendments." ECF 1 at 7. In particular, because Davitt is an appointed official, Fusaro claims that his proposed Letter does not relate to the electoral process. ECF 1, ¶¶ 34, 35. Specifically, "Fusaro's letter does not . . . call for Davitt's election or defeat . . . ." ECF 1, ¶ 35. The Letter "has nothing to do with an election" and is "not related to

-8-

the electoral process." ECF 1, ¶¶ 5, 26. Therefore, Fusaro fears prosecution under E.L. §§ 3-506(a)(1)(ii) and (c). *Id.* ¶ 3.

According to Fusaro, "limiting use of the voter list to purposes 'related to the electoral process' is a content-based restriction that prohibits the use of the registered voter list for political speech that is entitled to just as much protection as election-related speech." *Id.* ¶ 38. Further, he alleges that the "law serves no compelling interest, and is not properly tailored to serve any governmental interest." *Id.*[6]

Additional facts are included in the Discussion.

## II.    Standard of Review

Defendants have moved to dismiss, arguing, *inter alia*, that E.L. § 3-506(a) regulates access to government-held records, to which Fusaro lacks a First Amendment right of access. *See* ECF 20-1 at 8-14. Therefore, defendants aver that Fusaro has failed to state a claim under the First Amendment. *Id.* at 7. Accordingly, defendants ask the Court to dismiss the Complaint as well as the PI Motion. *Id.* at 34.

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter

---

[6] In Fusaro's Opposition to the Motion to Dismiss, he indicates some doubt as to whether Count II is ripe for adjudication. Plaintiff states, ECF 21 at 21: "[W]ithout access to the registered voter list, Fusaro does not have standing to challenge the content restrictions placed on its use [in Count II]. . . . Count II is ripe for review the very moment the Court rules in favor of Fusaro for Count I."

of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ."); *see also Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). But, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, ___ U.S. ___, 135 S. Ct. 346, 346 (2014) (per curiam).

Nevertheless, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action it is insufficient. *Twombly*, 550 U.S. at 555. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Semenova v. MTA*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts generally do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses'" through a Rule 12(b)(6) motion. *Edwards,* 178 F.3d at 243 (quoting *Republican Party v. Martin,* 980 F.2d 943, 952 (4th Cir. 1992)). However, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.'"* *Goodman,* 494 F.3d at 464 (quoting *Forst,* 4 F.3d at 250) (emphasis

in *Goodman*).

In evaluating the sufficiency of a complaint in connection with a Rule 12(b)(6) motion, a court ordinarily "may not consider any documents that are outside of the complaint, or not expressly incorporated therein . . . ." *Clatterbuck v. City of Charlottesville,* 708 F.3d 549, 557 (4th Cir. 2013); *see Bosiger,* 510 F.3d 442, 450 (4th Cir. 2007). However, a court may properly consider documents incorporated into the complaint or attached to the motion to dismiss, "'so long as they are integral to the complaint and authentic.'" *U.S. ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency,* 745 F.3d 131, 136 (4th Cir. 2014) (quoting *Philips v. Pitt Cty. Memorial Hosp.,* 572 F.3d 176, 180 (4th Cir. 2009)); *see Six v. Generations Federal Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015); *Anand v. Ocwen Loan Servicing, LLC,* 754 F.3d 195, 198 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.,* 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied,* 543 U.S. 979 (2004).

To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point,* LLC, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted; emphasis in original); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167 (citing *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998)). "When the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the

contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 822 F.3d at 167. Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

A court may also "consider a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations omitted); *see also Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 558 (Dec. 11, 2017); *Kensington Volunteer Fire Dep't. v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012).

As indicated, Fusaro submitted several exhibits with his suit. *See* ECF 1-1 (the Letter); ECF 1-2 at 2 (the Application); ECF 1-2 at 3 (photocopies of money orders used by Fusaro to pay Application and C.D. fees); ECF 1-3 (the Rejected Application); ECF 1-4 (email correspondence between Fusaro and Ms. Dennis, dated September 4, 2017, and September 6, 2017). Because these exhibits were submitted with the suit, I may consider them without converting the Motion to Dismiss to one for summary judgment. *See Goines*, 822 F.3d at 166; *U.S. ex rel. Oberg*, 745 F.3d at 136; *Anand*, 754 F.3d at 198; *Am. Chiropractic Ass'n*, 367 F.3d at 234; *Phillips*, 190 F.3d at 618; *see also* Fed. R. Civ. P. 10(c).

Defendants have also submitted exhibits. *See* ECF 20-2 (publically available court documents pertaining to the 2016 prosecution of Fusaro in the District Court for Anne Arundel County); ECF 20-3 (the publically available Application for Voter Registration Data). A court "may properly take judicial notice of 'matters of public record' and other information that, under Fed. R. Evid. 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508 (quoting

*Philips,* 572 F.3d at 180); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011).

In particular, pursuant to Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." And, courts may take judicial notice of publicly available records without converting a motion to dismiss to one for summary judgment. *See, e.g.*, *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015) ("[C]ourts are permitted to consider facts and documents subject to judicial notice without converting the motion to dismiss into one for summary judgment.").

Court documents from the prosecutions of Fusaro, including the materials submitted at ECF 20-2, are available to the public. Additionally, the State of Maryland Application for Voter Registration Data, submitted as ECF 20-3, is publically available.[7] Accordingly, I may take judicial notice of the exhibits submitted with the consolidated Motion to Dismiss and Opposition to the PI Motion, without converting the Motion to Dismiss to one for summary judgment. *See Zak*, 780 F.3d at 607.

Moreover, plaintiff has submitted an exhibit with his Opposition to the Motion to Dismiss. *See* ECF 21-1 (Final Judgment on Consent, signed by District Judge Rudi M. Brewster and the parties to *United Reporting Publishing Corp. v. Cal. Highway Patrol,* B-AJB-96-888 (S.D. Cal. Aug. 14, 2001)). The court document, filed as ECF 21-1, is available to the public. Accordingly, I may take judicial notice of it.

---

[7] *See* STATE OF MARYLAND, APPLICATION FOR VOTER REGISTRATION DATA (last visited August 3, 2018), https://elections.maryland.gov/pdf/SBEAPPL.pdf.

### III.    Discussion

### A.  Motion to Dismiss

As noted, on August 24, 2017, Fusaro submitted his Application for the List to the Board. ECF 1-2 at 2.  On the Application, Fusaro stated that he is a Virginia resident.  *Id.*  The Application was rejected by Ms. Dennis, an employee of the Board, because Fusaro is not a Maryland registered voter.  *See* ECF 1-3 (Rejected Application); ECF 1-4 (email from Ms. Dennis to Fusaro, dated September 6, 2017); *see also* E.L. § 3-506(a)(1).

Fusaro does not dispute the veracity of the Board's stated reason for the denial of the Application.  *See, e.g.*, ECF 1, ¶ 30.  Nor does he argue that the Application was rejected because of any intent by Fusaro to use the List for the purpose of engaging in political speech.  *See* ECF 1, ¶ 30; ECF 1-3; ECF 1-4.  Rather, he contends that limiting access to the List to Maryland registered voters "selectively advantages some political speakers and disadvantages others." *Id.*

According to Fusaro, E.L. § 3-506(a)(1) violates the First Amendment because, under that provision, only Maryland registered voters can obtain a copy of the List from the Board.  *See* ECF 1, ¶ 30.  Defendants argue that Fusaro has failed to state a claim.  ECF 20-1 at 7, 27.

In their Motion, defendants contend that Fusaro does not have a First Amendment right to the List.  *See* ECF 20-1 at 8-14.  They note that the Board rejected Fusaro's application because he is not a Maryland resident or a Maryland registered voter.  ECF 1-4 at 3.  The Board did not determine whether plaintiff's proposed use of the List was "related to the electoral process." *Id.* Further, defendants observe that "there are countless ways Mr. Fusaro could publicly criticize his former prosecutor," without regard to the List, and they insist that E.L. § 3-506 is "constitutionally sound."  ECF 20-1 at 7.

In addition, defendants observe that there are almost four million registered voters in

-15-

Maryland.  The Application for Voter Registration Data (ECF 20-3) indicates that the "Registered Voters List" contains name, party, gender, residential address, mailing address and other personal information.  They describe it as a "trove of sensitive information," maintained at the expense of Maryland taxpayers.  ECF 20-1 at 12.

As defendants see it, E.L. § 3-506(a)(1)(i) does not regulate speech.  It regulates access to government records.  ECF 20-1 at 14-15.  According to the State, the price of the List is subsidized and the requirement of residency confers the benefit to the taxpayers who fund the process.  ECF 20-1 at 22.

E.L. §§ 3-506(a) and (c) state:

(a)(1) A copy of a list of registered voters shall be provided to a Maryland
registered voter on receipt of:
    (i) a written application; and
    (ii) a statement, signed under oath, that the list is not intended to be used for:
        1. commercial solicitation; or
        2. any other purpose not related to the electoral process.

            *      *      *

(c) A person who knowingly allows a list of registered voters, under the person's
control, to be used for any purpose not related to the electoral process is guilty of
a misdemeanor and, on conviction, is subject to the penalties under Title 16 of this
article.

E.L. §§ 16-501(a)(1) and (a)(2) provide: "A person may not willfully and falsely take an oath or affirmation prescribed (1) by the State Board; or (2) pursuant to this article."  And, E.L. § 16-501(c) states:  "Any person who violates subsection (a) of this section is guilty of perjury and shall be punished according to the laws of the State for perjury."  Pursuant to Md. Code (2012 Repl. Vol., 2017 Supp.), § 9-101(b) of the Criminal Law Article, perjury is a misdemeanor that, upon conviction, shall result in "imprisonment not exceeding 10 years."

The First Amendment provides, in relevant part: "Congress shall make no law . . .

abridging the freedom of speech, or of the press . . . ." U.S. CONST. amend. I.  It applies to the

states pursuant to the Fourteenth Amendment.  *See Stromberg v. California,* 283 U.S. 359, 368

(1931); *see also Snyder v. Phelps*, 580 F.3d 206, 214 n.4 (4th Cir. 2009), *aff'd*, 562 U.S. 443

(2011).

However, "[n]either the First Amendment nor the Fourteenth Amendment mandates a

right of access to government information or sources of information within the government's

control."  *Houchins v. KQED, Inc.*, 438 U.S. 1, 9 (1978) (plurality); *see id.* at 16 (Stewart, J.,

concurring) ("The First and Fourteenth Amendments do not guarantee the public a right of

access to information generated or controlled by government. . . .");[8] *Los Angeles Police Dep't v.*

*United Reporting Pub. Corp.*, 528 U.S. 32, 40 (1999) (hereinafter, *United Reporting*) ("[W]hat

we have before us is nothing more than a governmental denial of access to information in its

possession.  [The State] could decide not to give out [such] information at all without violating

the First Amendment.[]") (citing *Houchins*, 438 U.S. at 14) (footnote omitted).

The case of *Houchins v. KQED, Inc.*, 438 U.S. 1, is informative.  There, the KQED

broadcasting organization requested permission to inspect and take pictures inside the Santa Rita

jail (the "Jail").  *Id.* at 3.  When the request was denied by the Jail, KQED and the Alameda and

Oakland branches of the National Association for the Advancement of Colored People

("NAACP") filed suit, alleging the Jail "had violated the First Amendment by refusing to permit

. . . access and failing to provide any effective means by which the public could be informed of

conditions prevailing in the [Jail] facility or learn of the prisoners' grievances."  *Id.* at 4.  The

---

[8] Although *Houchins*, 438 U.S. 1, was a plurality opinion, a majority of the Court
concluded there is no First or Fourteenth Amendment right of access to government information.
*See id.* at 9, 16 (Burger, White, Rehnquist, and Stewart); *id.* at 16 (noting that Justices Marshall
and Blackmun took no part in the consideration or decision of *Houchins*); *id.* at 19 (Stevens,
Brennan, and Powell, dissenting).

plaintiffs argued, *id.*: "Public access to such information was essential . . . in order for NAACP members to participate in the public debate on jail conditions in Alameda County."

The District Court preliminarily enjoined the Jail from denying access to the plaintiffs. 438 U.S. at 6. On interlocutory appeal, the Court of Appeals for the Ninth Circuit "concluded . . . that the public and the media had a First and Fourteenth Amendment right of access to prisons and jails, and sustained the District Court's order." *Id.* at 7.

Before the Supreme Court, KQED and the NAACP contended, *inter alia*, that the First Amendment contains "an implied special right of access to government-controlled sources of information." *Id.* at 7-8. The Supreme Court disagreed, stating there is "no basis for the claim that the First Amendment compels others — private persons or governments — to supply information." *Id.* at 11. The Court reasoned, *id.* at 12: "There are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow. For example, the prohibition of unauthorized entry into the White House diminishes the citizen's opportunities to gather information he might find relevant to his opinion of the way the country is being run, but that does not make entry into the White House a First Amendment right. *The right to speak and publish does not carry with it the unrestrained right to gather information.*" (Quoting *Zemel v. Rusk*, 381 U.S. 1, 16-17 (1965)) (emphasis in *Houchins*). And, the *Houchins* Court cautioned that courts "must not confuse what is 'good,' 'desirable,' or 'expedient' with what is constitutionally commanded by the First Amendment." *Houchins*, 438 U.S. at 13.

The Court concluded, *id.* at 14:

> There is no discernible basis for a constitutional duty to disclose, or for standards governing disclosure of or access to information. Because the Constitution affords no guidelines, absent statutory standards, hundreds of judges would . . . be at large to fashion ad hoc standards, in individual cases, according to their own ideas of what seems "desirable" or "expedient." We, therefore, reject the . . . conclusory assertion that the public and the media have a First

-18-

Amendment right to government information . . . .

> There is no constitutional right to have access to particular government information, or to require openness from the bureaucracy. The public's interest in knowing about its government is protected by the guarantee of a Free Press, but the protection is indirect. The Constitution itself is neither a Freedom of Information Act nor an Official Secrets Act.

(Citations omitted; some quotation marks omitted); *accord* 438 U.S. at 16 (Stewart, J., concurring).

The case of *United Reporting*, 528 U.S. 32, is also instructive. There, the Los Angeles Police Department (the "Department") maintained arrest records. *Id.* at 34. Prior to July 1, 1996, the United Reporting Publishing Corporation ("United Reporting") obtained arrestee information from the Department and sold that information to attorneys, insurance companies, driving schools, and substance abuse counselors. *Id.* However, effective July 1, 1996, § 6254(f)(3) of the California Code created "two conditions on public access to arrestees' addresses — that the person requesting an address declare [under penalty of perjury] that the request [was] being made for one of five prescribed purposes, and that the requester also declare that the address [would] not be used directly or indirectly to sell a product or service." *Id.* at 34 (citing § 6254(f)(3)).

United Reporting filed suit, arguing that § 6254(f)(3) was unconstitutional under the First and Fourteenth Amendments. *See* 528 U.S. at 36. However, United Reporting did not swear the oath necessary to obtain arrestee information, pursuant to § 6254(f)(3). *See id.* The District Court construed United Reporting's "claim as presenting a facial challenge" and concluded that "the statute was facially invalid under the First Amendment." *Id.* at 37. The Ninth Circuit affirmed the facial invalidation of § 6254(f)(3), concluding that the statute impermissibly restricted commercial speech. *Id.*

The Supreme Court disagreed and reversed, concluding that United Reporting "was not . . . entitled to prevail on a 'facial attack' of § 6254(f)(3)." 528 U.S. at 37. As to the "traditional rule" controlling a facial attack of a statute, the Court stated, *id.* at 38: "'[A] person to whom a statute may constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court.'" (Quoting *New York v. Ferber,* 458 U.S. 747, 767 (1982)). Further, the Court observed, 528 U.S. at 38:

> Prototypical exceptions to this traditional rule are First Amendment challenges to statutes based on First Amendment overbreadth. 'At least when statutes regulate or proscribe speech . . . the transcendent value to all society of constitutionally protected expression is deemed to justify allowing attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity.

(Quoting *Gooding v. Wilson,* 405 U.S. 518, 520-521, (1972)) (some internal quotation marks omitted).

Moreover, the Court noted that "the overbreadth doctrine is not casually employed. 'Because of the wide-reaching effects of striking down a statute on its face at the request of one whose own conduct may be punished despite the First Amendment, [the Court] ha[s] recognized that the overbreadth doctrine is 'strong medicine' and ha[s] employed it with hesitation, and then 'only as a last resort.'" *United Reporting*, 528 U.S. at 39 (quoting *Ferber,* 458 U.S. at 769).

According to the Court, 528 U.S. at 40, "at least for the purposes of facial invalidation," Cal. Code § 6254(f)(3) was "simply a law regulating access to information in the hands of the police department." The Court stated that § 6254(f)(3) did not establish grounds for "a case in which *the government is prohibiting a speaker from conveying information that the speaker already possesses*." 528 U.S. at 40 (citing *Rubin v. Coors Brewing Co.,* 514 U.S. 476 (1995))

(emphasis added).  Rather, the California statute "merely require[d] that if [United Reporting] wishe[d] to obtain the addresses of arrestees it must qualify under the statute to do so. . . .  For purposes of assessing the propriety of a facial invalidation, what we have before us is nothing more than a governmental denial of access to information in its possession.  California could decide not to give out arrestee information at all without violating the First Amendment.[1]"  *Id.* (citing *Houchins*, 438 U.S. at 14) (footnote omitted).

The Court concluded that United Reporting "may seek access under the statute on their own . . . without incurring any burden other than the prospect that their request will be denied.  Resort to a facial challenge here is not warranted because there is '[no] possibility that protected speech will be muted.'"  *Id.* at 41 (quoting *Bates v. State Bar of Ariz.,* 433 U.S. 350, 380 (1977)).

In Justice Scalia's concurring opinion in *United Reporting*, joined by Justice Thomas, Justice Scalia noted that the Court did not address "whether a restriction upon access [to government information] that *allows* access to the press (which in effect makes the information part of the public domain), but at the same time *denies* access to persons who wish to use the information for certain speech purposes, is in reality a restriction upon speech rather than upon access to government information . . . ."  528 U.S. at 42 (emphasis in *United Reporting*).

Justice Ginsburg also wrote a concurring opinion, joined by Justices O'Connor, Souter, and Breyer.  She said, *id.* at 43: "To be sure, the provision of address information is a kind of subsidy to people who wish to speak to or about arrestees, and once a State decides to make such a benefit available to the public, there are no doubt limits to its freedom to decide how that benefit will be distributed.  California could not, for example, release address information only to those whose *political views* were in line with the party in power. . . .  But if the award of the subsidy is not based on an illegitimate criterion *such as viewpoint*, *California is free to support*

*some speech without supporting other speech*." (Emphasis added; citations omitted).

Justice Stevens dissented, joined by Justice Kennedy. He wrote, 528 U.S. at 45: "[T]he majority is surely correct in observing that 'California could decide not to give out arrestee information at all without violating the First Amendment.' Moreover, I think it equally clear that California could release the information on a selective basis to a limited group of users who have a special, and legitimate, need for the information." (Internal citation omitted). He added, *id.* at 45: "A different, and more difficult, question is presented when the State makes information generally available, but denies access to a small disfavored class." Further, Justice Stevens said, *id.* at 45-46: "As Justice Ginsburg points out, if the State identified the disfavored persons based on their *viewpoint, or political affiliation*, for example, the discrimination would clearly be invalid." (Citation omitted; emphasis added). Justice Stevens believed Cal. Code § 6254(f)(3) constituted "unconstitutional discrimination" because "the denial of access [was] based on the fact that respondent plans to publish the information to others who, in turn, intend to use it for a commercial speech purpose that the State finds objectionable." *Id.* at 46.

Therefore, six justices agreed that a state violates the First Amendment by limiting access to government-held information when the restriction is based on one's political viewpoint or party affiliation. *See id.* at 43 (Ginsburg, J., concurring); *see also id.* at 45-46 (Stevens, J., dissenting). But, only two Justices concluded the restriction at issue in *United Reporting* was untenable under the First Amendment. *Id.* at 46 (Stevens, J., dissenting).

The case of *Sorrell v. IMS Health, Inc.*, 564 U.S. 552 (2011), also provides guidance. *Sorrell* involved a commercial speech challenge to Vermont's Prescription Confidentiality Law, Vt. Code (2007), § 4631(d), which prohibited health insurers, pharmacies, and other entities from selling, licensing, or exchanging for value "records containing prescriber-identifiable

information, nor permit[ted] the use of regulated records containing prescriber-identifiable information for marketing or promoting a prescription drug, unless the prescriber consent[ed]." *Sorrell*, 564 U.S. at 558-59 (quoting Vt. Code § 4631(d)). Moreover, § 4631(d) prohibited pharmaceutical manufacturers and marketers from "us[ing] prescriber-identifiable information for marketing or promoting a prescription drug unless the prescriber consent[ed]    . . . ." *Id.* (quoting Vt. Code § 4631(d)).

Two suits were filed and consolidated, challenging Vermont's law under the First and Fourteenth Amendments. 564 U.S. at 561. One suit was brought by several "Vermont data miners" in the business of buying prescriber-identifiable information from pharmacies and using that information to "produce reports on prescriber behavior" that were then sold to pharmaceutical manufacturers. *Id.* at 558, 561. Another suit was filed by an association of pharmaceutical manufacturers. *Id.* at 561. The District Court denied relief. *Id.* at 561. But, the Second Circuit reversed, concluding that Vt. Code § 4631(d) violated the First Amendment by "burdening the speech of pharmaceutical marketers and data miners without adequate justification." *Id.*

On appeal, the Supreme Court noted that the Vermont Law "disfavors marketing, that is, speech with a particular content." *Id.* at 564. Thus, the Court found that Vt. Code § 4631(d) created a content-based restriction on speech. *Id.* Further, the Court said that § 4631(d) disfavored "specific speakers, namely pharmaceutical manufacturers." *Id.* Accordingly, the Court concluded that § 4631(d) imposed a speaker-based restriction on speech. *Id.* Therefore, the Court applied the heightened scrutiny test as to the Vermont statute and concluded that it violated the First Amendment. *Id.* at 566, 567, 572, 580.

Notably, the Court distinguished *Sorrell* from *United Publishing* in several important

ways.  564 U.S. at 568-70.  In particular, the *Sorrell* Court said the Court in *United Reporting* "did not rule on the merits of any First Amendment claim." *Id.* at 568.  In other words, the *United Publishing* Court concluded that, for the purposes of assessing a facial challenge to a statute, the California provision at issue was "nothing more than a governmental denial of access to information in its possession," which "California could decide not to give out . . . at all without violating the First Amendment.[1]"  528 U.S. at 40.  Therefore, no viable First Amendment claim was presented in *United Reporting*.  *See Sorrell*, 564 U.S. at 568-70.

Additionally, the *Sorrell* Court said, *id.* at 568:  "Vermont . . . imposed a restriction on access to information in private hands," which "confront[ed] the [*Sorrell*] Court with a point reserved, and a situation not addressed, in *United Reporting*. . . . [U]nlike in *United Reporting,* [the *Sorrell* Court had] 'a case in which the government [was] prohibiting a speaker from conveying information that the speaker already possesse[d].'"  (Quoting *United Reporting*, 528 U.S. at 40).  As the *Sorrell* Court observed, 564 U.S. at 568, "[t]he difference is significant.  An individual's right to speak is implicated when information he or she possesses is subjected to 'restraints on the way in which the information might be used' or disseminated."  *Id.* (quoting *United Reporting*, 528 U.S. at 40).

Further, the *Sorrell* Court noted that United Reporting had not sworn the required oath to obtain the California records, and the *United Reporting* Court had "assumed" the plaintiff "had not suffered a personal First Amendment injury and could not prevail only by invoking the rights of others through a facial challenge."  564 U.S. at 569.  In contrast, the plaintiffs in *Sorrell* had alleged that Vt. Code § 4631(d) "burden[ed] their own speech."  *Id.*

The *Sorrell* Court pointed to the concurring and dissenting opinions in *United Reporting*, 528 U.S. at 41-48, stating that "restrictions on the disclosure of government-held information can

facilitate or burden the expression of potential recipients and so transgress the First Amendment." *See Sorrell*, 564 U.S. at 569. However, the earlier review of the concurring and dissenting opinions in *United Reporting* provides limited guidance as to when a restriction on the disclosure of government-held information might implicate the First Amendment. *See United Reporting*, 528 U.S. at 41-48.

As the Supreme Court said in *Houchins*, 438 U.S. at 9, the First Amendment does not mandate "a right of access to government information or sources of information within the government's control." *See also id.* at 16 (Stewart, J., concurring). Indeed, Maryland "could decide not to give out [such] information at all without violating the First Amendment.[1]" *United Reporting*, 528 U.S. at 40 (citing *Houchins*, 438 U.S. at 14) (footnote omitted).

The Board's rejection of Fusaro's Application is not entirely akin to *Houchins*. In *Houchins*, the Jail denied access to the press *and* to the public at large. 438 U.S. at 4. Here, the Board grants access to registered Maryland voters, under certain conditions. *See* ECF 1-3; ECF 1-4; E.L. § 3-506(a)(1). However, that distinction is of little moment. As in *Houchins*, 438 U.S. 1, and *United Reporting*, 528 U.S. 32, Fusaro's suit "is not a case in which the government is prohibiting a speaker from conveying information that the speaker already possesses." *United Reporting*, 528 U.S. at 40; *see also Sorrell*, 564 U.S. at 568. Put differently, E.L. § 3-506(a)(1) does not prohibit Fusaro from using information he already possesses or could obtain to communicate with the public, including Maryland registered voters.

Notably, Fusaro's suit is also different from *Sorrell*, where the state had "imposed a restriction on access to information in private hands." 564 U.S. at 568. As indicated, *Sorrell* was "'a case in which the government [was] prohibiting a speaker from conveying information that the speaker already possesse[d].'" *Id.* (quoting *United Reporting*, 528 U.S. at 40). And, that

"difference [was] significant" because "[a]n individual's right to speak is implicated when information he or she possesses is subjected to 'restraints on the way in which the information might be used' or disseminated." *Sorrell*, 564 U.S. at 568.

As noted, Fusaro does not dispute that he was denied access to the List because he did not meet the threshold requirement that he must be a Maryland registered voter. ECF 1, ¶ 30; ECF 1-3; ECF 1-4; E.L. § 3-506(a)(1). Clearly, he was not denied access to the List because of his political views or party affiliation. *See* ECF 1-3; ECF 1-4; *see also United Reporting*, 528 U.S. at 42 (Ginsburg, J., concurring); 528 U.S. at 45-46 (Stevens, J., dissenting). Count I of Fusaro's Complaint does not touch upon the types of "illegitimate criterion" that implicate the First Amendment when "a State decides to make [information] . . . available to the public . . . ." *United Reporting*, 528 U.S. at 42.

Indeed, the residency restriction in E.L. § 3-506(a)(1)(i) is a reasonable threshold limitation on access to State records; it does not violate the Constitution. *See cf. McBurney v. Young*, 569 U.S. 221, 232 (2013) ("[W]e reject petitioners' sweeping claim that the challenged provision of the Virginia FOIA violates the Privileges and Immunities Clause because it denies them [as citizens of states other than Virginia] the right to access public information on equal terms with citizens of the Commonwealth. . . . This Court has repeatedly made clear that there is no constitutional right to obtain all the information provided by FOIA laws.") (citing *Houchins*, 438 U.S. at 14; *United Reporting*, 528 U.S. at 40; and *Sorrell*, 564 U.S. at 588 (Breyer, J., dissenting)).

In my view, given plaintiff's status as a Virginia resident, he has no First Amendment right to obtain a copy of the List from the Board. Accordingly, Count I fails to state a claim under the First Amendment.

Because Count II of the Complaint is predicated on Fusaro having a First Amendment right to obtain the List (*see* ECF 1, ¶ 3; ECF 21 at 21), I need not reach Count II.

### A. Motion For Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)); *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 345 (4th Cir. 2009), *vacated on other grounds and remanded*, 559 U.S. 1089 (2010), *reaff'd in part and remanded*, 607 F.3d 355 (4th Cir. 2010). Rather, a preliminary injunction is "'granted only sparingly and in limited circumstances.'" *Micro Strategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir. 1991)).

Thus, "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20 (citing *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008); *Amoco Prod Co. v. Gambell*, 480 U.S. 531, 542 (1987); and *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-12 (1982)); *see also Real Truth About Obama*, 575 F.3d at 345 (applying the standard for preliminary injunctions set forth in *Winter*). A preliminary injunction cannot be issued unless all four of these elements are met, and "'[p]laintiff bears the burden of establishing that each of these factors supports granting the injunction.'" *Direx Israel*, 952 F.2d at 812 (quoting *Tech. Publ'g Co. v. Lebhar-Friedman, Inc.*, 729 F.2d 1136, 1139 (7th Cir. 1984); *Shaffer v. Globe Prod, Inc.*, 721 F.2d 1121, 1123 (7th Cir. 1983)).

Because Fusaro lacks the First Amendment right to obtain the List from the Board, he

cannot succeed on the merits of his suit.  Therefore, the PI Motion is subject to dismissal.

### IV.    Conclusion

For the foregoing reasons, defendants' Motion to Dismiss shall be granted.  And, Fusaro's PI Motion shall be denied.  An Order follows.

Date:  September 4, 2018                              _____/s/_____
                                                      Ellen Lipton Hollander
                                                      United States District Judge