UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| DENNIS FUSARO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17-cv03582-ELH |
| | ) | Hon. Ellen L. Hollander |
| MICHAEL R. COGAN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF DENNIS FUSARO'S MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Dennis Fusaro has a letter to send to Maryland registered voters. When Fusaro brought this lawsuit in 2017, his letter would have informed recipients of his earlier prosecution under Maryland election law and encouraged them to call for Maryland State Prosecutor Emmet Davitt to resign. *See* Dkt. 1-1. Following Davitt's retirement earlier this year, Fusaro now aims to encourage voters to engage the state prosecutor's office in hopes of ensuring Davitt's abuses never occur again, including under the supervision of State Prosecutor Charlton Howard. *See* Dkts. 41-3, 52. Two provisions of the same section of Maryland election law prevent Fusaro from sending his letter: the requirement that the Maryland State Board of Elections ("SBE") only provide copies of the list to Maryland registered voters, and the restriction on recipients from using the list for purposes not related to the electoral process, enforced by both the SBE and the Office of the State Prosecutor ("OSP"). MD. CODE ANN. ELEC. LAW ("E.L.") § 3-506 ("Section 3-506"). With chilling irony, after enduring one political trial by the OSP, Fusaro could be prosecuted again by the same office for using a registered voter list to speak out about that earlier case. Both the access and use

restrictions on in Section 3-506 are abridgements of the rights to free speech, press and petition under the First Amendment, and this Court should issue summary judgment declaring these provisions unconstitutional. U.S. CONST. amend I.

## STATEMENT OF MATERIAL FACTS

### Procedural History

Fusaro brought this suit against the State Prosecutor and members of the SBE in their official capacities on December 4, 2017 and filed a motion for preliminary injunction on December 15, 2017. Dkt. 1, 17. The defendants filed a motion to dismiss on January 26, 2018. Dkt. 20. This Court dismissed Fusaro's claim regarding access to the registered voter list on September 4, 2018, and dismissed his challenges to the use of the registered voter list—including that the term "electoral process" is unconstitutionally vague—as moot. Dkt. 26 at 26–27. Following appeal, on July 12, 2019, the United States Court of Appeals for the Fourth Circuit ruled that the First Amendment is implicated by the access provisions of section 3-506, and remanded for this Court to consider these access provisions under the *Anderson-Burdick* framework, with further instructions to consider whether the "electoral process" restriction is unconstitutionally vague. Dkt. 35 at 42–44; *Fusaro v. Cogan*, 930 F.3d 241, 263–64 (4th Cir. 2019); *see generally Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992). After a supplemental complaint by Fusaro and discovery, the parties are filing cross-motions for summary judgment. Dkts. 41-2, 41-3, 50.

### The Provision of Maryland Registered Voter Lists Under E.L. § 3-506

Maryland registered voters may apply to purchase a list of registered voters from the SBE pursuant to Section 3-506. *See also* Code of Maryland Regulations ("COMAR") 33.03.02.04 (attached as **Addendum A**). The current version of the application is attached as **Exhibit 1**. *See*

https://elections.maryland.gov/pdf/SBEAPPL.pdf. The price remains $125.00 for a statewide list, and an additional $3.00 if one wishes to have the list provided on a compact disc. *Id.* A list provided under Section 3-506 is drawn from a database known as MDVOTERS. Rule 30(b)(6) Deposition of SBE ("SBE Depo."), **Exhibit 2** at 16-17[1]; *see also Judicial Watch, Inc. v. Lamone*, No. CV ELH-17-2006, 2019 WL 4168870, at *4 (D. Md. Sept. 3, 2019). MDVOTERS is "a live database, meaning that it's updated every day[.]" SBE Depo., Exh. 2 at 40. A list of registered voters includes a voter's name and address, and can also include voting history. *Id.* at 17; *see* Exh. 1 (allowing for purchasers to acquire "voting history"); Dkt. 1-2 (Fusaro requested voting history, which is provided for up to 5 elections with a statewide list). MDVOTERS contains roughly 4 million names of Maryland registered voters, who are eligible to apply for the list. SBE Depo., Exh. 2 at 40; **Exhibit 3** (response to SBE interrogatory #2). "[I]t would take the [SBE] less than 6 hours, of which less than 1 hour would constitute active work by a[n SBE] employee, to generate a file constituting the list of registered voters requested by Mr. Fusaro, burn that file to a CD, and prepare the CD for delivery to Mr. Fusaro." Exh. 3 (response to SBE request for admission #1).

The SBE has received 1,112 applications for the list from January 1, 2010 to November 1, 2019. Exh. 3 (response to SBE interrogatory #3, Exhibit A). It rejected 23 of these applications, based on lack of payment or due to an applicant's lack of status as a Maryland registered voter. *Id.* (response to SBE interrogatory #4); SBE Depo., Exh. 2 at 20-21. The SBE claims that access to the list—that is, considering an individual application for the list—is not intertwined with the commercial solicitation or electoral process restrictions in the law. SBE Depo., Exh. 2 at 23-25; Exh. 3 (response to SBE interrogatory #6). However, the SBE "temporarily suspended the

---

[1] The citations to deposition excerpts included as Exhibits 2 and 7 cite to the original page numbers of those depositions.

processing of applications for voter registration lists" for a data company, Catalist, in 2014, pending answers to an inquiry regarding an alleged misuse of a previously provided list by a third party, the AARP. Exh. 3 (response to SBE interrogatory #6); **Exhibit 4** (SBE00001-00002, SBE00009-00014).

### The "Electoral Process" Restrictions in E.L. § 3-506 and Its Enforcement

To obtain a registered voter list under Section 3-506, applicants must swear that "the list is not intended to be used for: 1. commercial solicitation; or 2. any other purpose not related to the electoral process." E.L. § 3-506(a)(1)(ii); Add. A (COMAR 33.03.02.04); Exh. 1.[2] Willfully and falsely taking an oath prescribed by the SBE is punishable as perjury, with imprisonment of up to 10 years. E.L. § 16-501(a), (c); MD. CODE ANN., CRIM. LAW ("C.L.") § 9-101(b). Inducing or procuring another person to willfully and falsely take an oath prescribed by the SBE is punishable as subornation of perjury and is also subject to a penalty of up to a decade of imprisonment. E.L. § 16-501(b), (d); C.L. § 9-102(b). If one "knowingly allows a list of registered voters, under the person's control, to be used for any purpose not related to the electoral process[,]" it is separately punishable as a misdemeanor, with fines up to $250 and up to six months of imprisonment. E.L. §§ 3-506(c), 16-1001(a).

The SBE has no documents defining "electoral process." SBE Depo., Exh. 2 at 24-25. The SBE's 30(b)(6) designee testified that the board has the authority to determine whether a specific piece of mail such as Fusaro's meets the "electoral process" standard, but then testified that it does not. *Compare id.* at 32 *with id.* at 43-44. The SBE claims it would forward complaints regarding violations of the "electoral process" provision to the State Prosecutor. *See, e.g.*, *id.* at 24. However,

---

[2] Notably, the law requiring the oath, the regulation prescribing the oath, and the oath itself are all different. *See infra* part IV.

the SBE has never done so. Exh. 3 (response to SBE interrogatory #6); SBE Depo., Exh. 2 at 46.

Moreover, the SBE has declined to forward complaints regarding uses of the list that, in its

judgment, have constituted purposes related to the electoral process. SBE Depo., Exh. 2 at 44-45;

*see also* Exh. 3 (responses to SBE requests for admission #3 and #4). The SBE has also informally

enforced the provision by demanding a citizen remove a list made publicly available for free

online; the citizen complied. SBE Depo., Exh. 2 at 41-43; Exh. 3 (response to SBE interrogatory

#6). With this informal authority, the SBE considers the definition of "electoral process" to be, or

include, roughly:

- "[M]ostly to send out direct mail pieces from candidates, from campaigns, who to vote for, vote against . . ." SBE Depo., Exh. 2 at 28.

- "[C]ampaign[ing] or the ability to elect and influence Maryland voters." *Id.* at 36.

- "[I]nform[ing] every Maryland registered voter of [a candidate's] legislative accomplishments in order to increase his visibility or his electability[.]" *Id.* at 39.

- "[N]ot black letter law, meaning that it's not as clear as a six-thousand dollar [campaign finance] contribution limit[.]" *Id.* at 30-31.

Nevertheless, the SBE's 30(b)(6) designee would not answer whether either of Dennis Fusaro's

letters would meet the definition or not, conceding only that the letters are "not in the normal

electoral arena, meaning that it's not from the candidate influencing a person's vote to promote or

defeat a candidate." *Id.* at 32-33, 47-48. Though the SBE disclaims authority over election law

provisions that it is not specifically authorized to enforce, its designee for this case previously

testified under oath regarding the application of just such a provision of election law during Dennis

Fusaro's criminal trial in 2017. **Exhibit 5** (excerpt of Jared DeMarinis testimony regarding the

definition of "campaign material" and its application to e-mail).

The State Prosecutor declined to address how he would determine whether a use of a

registered voter list is related to the electoral process. **Exhibit 6** (response to OSP interrogatory

#3). "[T]here is no formal or informal policy that guides the OSP's interpretation of [Section] 3-506(c) for the purpose of investigating potential violations of, and enforcing, that statute." *Id.* Moreover, "to date, the OSP has not had occasion to 'determine whether a use of a registered voter list is "related to the electoral process"' in connection with any prosecution of any person for violation of [Section] 3-506(c)[.]" *Id.* When presented with Fusaro's letters, the State Prosecutor declined to admit or deny that either letter, if delivered using addresses drawn from a registered voter list obtained from the SBE, would violate Section 3-506(c). *Id.* (responses to OSP requests for admission #s 1 and 2). In declining to do so, the State Prosecutor deferred to "the triers of fact and law in a criminal proceeding," asserted that there is no applicable precedent, that he has prosecutorial discretion, and "that determination depends on numerous other factors not addressed by the abstract hypothetical presented in the request" and two years of litigation. *Id.*; *but see* FED. R. CIV. P. 36(a)(1).

**Dennis Fusaro's Access to, and Use of, the List**

Dennis Fusaro has extensive experience in direct mailing efforts for election campaigns and issue advocacy. Deposition of Dennis Fusaro ("Fusaro Depo."), **Exhibit 7** at 21-37. Fusaro sought a list of registered voters from the SBE in August, 2017. *See* Dkt. 1-2. Fusaro's application complied with all requirements of Section 3-506 except for his inability to be a Maryland registered voter. Exh. 3 (answer to SBE request for admission #2); *see* Dkts. 1-2, 1-3. He initially intended to use the list to send a letter to certain Maryland registered voters regarding former State Prosecutor Davitt. Dkt. 1-1; *see* Fusaro Depo., Exh. 7 at 68-72. Following Davitt's retirement, Fusaro would now like to send a letter to certain registered voters about the power of the state prosecutor, the abuse of that power, and to urge recipients to "send a message to Davitt's replacement" in the office. Dkt. 41-3; *see also* Fusaro Depo., Exh. 7 at 106 ("[T]here's a risk that

[Davitt's] previous example may be adopted by the current State prosecutor who may wish to continue [Davitt's] tyrannical policy of prosecuting free speech in Maryland in violation of the U.S. Constitution and Supreme Court precedent."), 108-109.

Fusaro believes Maryland registered voters make up the best audience for his letter. *See, e.g.*, Fusaro Depo., Exh. 7 at 56, 75, 79-80, 84-85. Having asked for voting history to be included with his list, he would use that to help select among the most engaged Maryland voters to send his letter. Dkt. 1-2. Fusaro would generally draw upon his experience and factors such as voting history to select specific recipients from the statewide list. Fusaro Depo., Exh. 7 at 78. In Fusaro's experience, direct mail is superior to general print advertising and internet advertising. *Id.* at 82-84. Alternatives for mailing, such as Every Door Direct Mail from the U.S. Postal Service, are likewise expensive, "not . . . the best way" and "scattershot" by comparison to having his own list from the SBE. *Id.* at 86-87. Fusaro believes that campaign finance disclosure lists are distinct from registered voter lists "[b]ecause in changing public policy, sometimes angry voters trump donors." *Id.* at 102-105. Fusaro is concerned about the expense and accuracy of voter lists available from third parties. *Id.* at 88, 115. Fusaro's budget for mailing is currently in the hundreds of dollars, but if he acquires a copy of the list he would seek donations to finance a wider mailing of his letter. *Id.* at 80-81.

Fusaro is uncertain about the definition of "related to the electoral process." Fusaro Depo., Exh. 7 at 66-67 ("There seems to be no rationality and a certain animus."); Declaration of Dennis Fusaro ("Fusaro Decl."), ¶2. He believes that if he acquired the list and used it to send his letter regarding former State Prosecutor Davitt or his current letter that he would be prosecuted for using the list for a purpose not related to the electoral process and for committing perjury. Fusaro Decl., ¶4; *see* Exh. 6 (response to OSP request for admission #3). He believes that if he acquired the list

from a third party and used it to send either letter that he would be prosecuted for suborning perjury from the original applicant. Fusaro Decl., ¶5.

## ARGUMENT

The First Amendment states, in pertinent part, that "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. CONST. amend. I.  The First Amendment is applicable to state law pursuant to the Fourteenth Amendment. U.S. CONST. amend XIV; *see Snyder v. Phelps*, 580 F.3d 206, 214 (4th Cir. 2009), *aff'd*, 562 U.S. 443 (2011). "[C]ore political speech need not center on a candidate for office." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995). Indeed, "[c]ompetition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms." *Williams v. Rhodes*, 393 U.S. 23, 32 (1968). The access and content provisions of Section 3-506, though subject to different forms of scrutiny under First Amendment precedent, abridge Dennis Fusaro's right to political speech and should be stricken by this Court.

## I.     Summary Judgment Standard Is Appropriate At This Time

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue is genuine and a fact is material if, under the substantive law of the case, resolution of the factual dispute

could affect the outcome "such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The movant bears the initial burden of either establishing that no genuine issue of material fact exists or that a material fact essential to the non-movant's claim is absent. *Celotex Corp.*, 477 U.S. at 322–24. Once the movant has met his burden, the onus is on the non-movant to establish that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In cases like the present, in which there are cross-motions for summary judgment, "the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law," and in considering each motion "the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citations and internal quotation marks omitted). When cross-motions for summary judgment demonstrate a basic agreement concerning what legal theories and material facts are dispositive, they "may be probative of the non-existence of a factual dispute." *Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983).

The facts summarized above demonstrate Fusaro's standing, the ripeness of the case and the merits of Fusaro's claims. He was denied a copy of the list under a law that he has challenged under the First Amendment. Likewise, the facts illustrate the outright censorship or lack of definition to the "electoral process" restriction, either of which chill Fusaro's access to and use of the list for political speech. The issues before this Court are "'purely legal, and will not be clarified by further factual development.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) (quoting *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 581 (1985)). Summary judgment is appropriate at this time.

## II.    *Anderson-Burdick* Balancing Favors Dennis Fusaro's First Amendment Right to Obtain a Copy of a Maryland Registered Voter List

On appeal, the Fourth Circuit recognized that "the List is a means of political communication, and the combined effect of the content- and speaker-based restrictions contained in § 3-506 present a sufficient risk of improper government interference with protected speech that Fusaro may challenge § 3-506 in federal court." *Fusaro*, 930 F.3d at 256. On remand, the appellate court instructed this Court to consider the registered voter provisions of Section 3-506(a)(1) in light of the *Anderson-Burdick* framework. *Id.* at 263–64. The Fourth Circuit concluded that the access provisions do not severely burden free speech, and ruled that strict scrutiny does not apply to the access provisions of section 3-506. *Id.* at 263. Thus, "'[this C]ourt must balance the character and magnitude of the burdens imposed against the extent to which the regulations advance the state's interests in ensuring that "order, rather than chaos, is to accompany the democratic processes.'"" *Id.* at 258 (quoting *McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215, 1221 (4th Cir. 1995) (citation omitted)). This balancing tips toward Fusaro.

The character of the burden imposed on Fusaro by the registered voter requirement is evident, and correlates to the value of a registered voter list from the SBE. The mere provision of the list by the SBE evinces its value: a statewide list provides access to the 4 million out of an estimated 6 million Marylanders who are civic-minded enough to have registered to vote. *See QuickFacts: Maryland*, U.S. CENSUS BUREAU, https://www.census.gov/quickfacts/MD. The MDVOTERS database is a tool for the state government to oversee and manage elections, and the provision of lists drawn from this database to citizens serves this purpose and also bolsters electoral engagement. *See Judicial Watch*, 2019 WL 4168870 at *8, *16 (ruling Section 3-506 is preempted by section 8(i) of the National Voter Registration Act of 1993); *see also Socialist Workers Party v. Rockefeller*, 314 F. Supp. 984, 995–96 (S.D.N.Y.), *aff'd*, 400 U.S. 806 (1970). The limited hints

the SBE provided for a definition of "electoral process" all indicate that lists are tied to campaigning for elected office, or core First Amendment activity. *See* SBE Depo., Exh. 2 at 28, 36, 39, 47-48. The MDVOTERS database is updated almost daily, and thus lists from the SBE— particularly statewide lists, such as the one Fusaro applied for—provide the most up-to-date data regarding Maryland registered voters. *Id.* at 40; Dkt. 1-2. Assuming Fusaro can access a list from third parties—a tenuous suggestion, at best—in Fusaro's experience these are provided at significantly higher prices, and he cannot know the timeliness or accuracy of such lists, certainly not to the extent as a list obtained directly from the SBE. Fusaro Depo., Exh. 7 at 115; *see infra* part IV. The value of registered voter lists is almost self-evident, and thus the SBE's denial of access to lists by Fusaro is burdensome on his political engagement.

The magnitude of the burden of the registered voter requirement on Fusaro is not, as the Fourth Circuit ruled, severe, but it is serious. For a mere $125, Maryland registered voters may access, in a matter of days, the most up-to-date statewide voter registration information drawn from the MDVOTERS database. This audience is exclusively accessible in this format from the SBE. As Fusaro ably testified, for direct mail purposes, there is no product like the registered voter list. *See, e.g.*, Fusaro Depo., Exh. 7 at 86-87, 102-105. Assuming, for a moment, that Fusaro may acquire a list from third parties, a price markup is likely and he cannot be assured of its timeless or accuracy. *Id.* at 88, 115; *see infra* part IV. The list is a valuable political tool, and denying it to Fusaro is a serious burden.

On the other side of the scale, the state's interests in restricting access to the list to Maryland registered voters are legally dubious. In discovery, the defendants asserted three interests, the first two arising from privacy:

> By restricting access to its voter lists to Maryland registered voters, Maryland
> ensures that only those who have a direct, personal interest in the privacy of the

> information contained on such lists are entitled to obtain the lists in the first place. This, in turn, makes it more likely that the individual who obtains the lists will take greater care to ensure that the privacy rights of individuals appearing on the lists are preserved.

Exh. 3 (answer to SBE interrogatory #5); Exh. 6 (answer to OSP interrogatory #2). The SBE added that it "receives approximately 15 to 30 complaints from voters per year regarding the availability of these voters' information through records available from the State Board." Exh. 3 (answer to SBE interrogatory #5). Tied into this, the defendants also assert an interest "to encourage Maryland residents to register to vote (or to maintain their voter registration)." *Id.*; Exh. 6 (answer to OSP interrogatory #2). Finally, the SBE asserted that the registered voter requirement "ensure[s] that only people whose tax dollars maintain the list can take advantage of its subsidized price." Exh. 3 (answer to SBE interrogatory #5).

These interests are not only conclusory, but contradicted by the evidence. It does not follow that because one is included in a list of four million people that he or she will be any more or less likely to refrain from using it to "conduct outreach, marketing, solicitation (commercial or otherwise), or polling."[3] Exh. 3 (answer to SBE interrogatory #5); Exh. 6 (answer to OSP interrogatory #2). Though a list from the SBE is very valuable for ease of engagement with Maryland registered voters, that cannot be construed with privacy: as the Fourth Circuit noted, the information contained in the list is otherwise publicly available via voter registration records. *Fusaro*, 930 F.3d at 246 (citing E.L. § 3-505(b)(1)). This Court recognized the same recently under

---

[3] By tying the registered voter requirement to these uses of the list, the defendants arguably concede that the registered voter requirement is actually a content-based restriction on speech. *See Reed v. Town of Gilbert*, 135 S.Ct. 2218, 2227 (2015) ("Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose."). That is, access restrictions on the list are based on what users will say rather than who they are. *See infra* part III(A).

federal law in *Judicial Watch*. 2019 WL 4168870 at *9 (citing 52 U.S.C. § 50207(i)(1)). No court has ever recognized what one might call an ecumenical version of privacy, served by mutual presence on the same list that is made up of otherwise public information. This likewise dispels the 15 to 30 complaints (out of more than four million registered voters) that the SBE receives per year, or that anyone is truly chilled from registering to vote by presence on a registered voter list.

Finally, the subsidy argument is so improperly tailored that it is not cognizable. To be sure, residency requirements are recognized in state public records cases in part because residents' taxes fund the government and production of records. *See Fusaro*, 930 F.3d at 262 (quoting *Los Angeles Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32, 43 (1999) (Ginsburg, J. concurring)). But the registered voter requirement under Section 3-506 exempts roughly a third of Marylanders, too. Moreover, unlike a tailored request under a freedom of information act, which requires a civil servant to take the time to search for specific documents, the process for producing registered voter lists from MDVOTERS database is established and uniform, complete with an order form. *See* Exh. 1. The database, a tool for the SBE to oversee Maryland elections, will be updated, anyway. *See generally Judicial Watch*, 2019 WL 4168870 at *4. It is far more likely that the $128 fee Fusaro would pay for a list would constitute recovery against a sunk cost by Maryland, not the granting of a subsidy to Fusaro, particularly as the process of providing him the list takes "less than 1 hour . . . [of] active work by a[n SBE] employee[.]" *See* Exh. 3 (response to SBE request for admission #1).

"'In passing judgment, the Court must not only determine the legitimacy and strength of each [governmental] interest[]; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Fusaro*, 930 F.3d at 257 (quoting *Anderson*, 460 U.S. at 789). Even assuming the state has an interest in restricting access to registered voter lists,

13

balancing against Fusaro's political speech nevertheless weighs in favor of Fusaro. Even affording "substantial deference" to the interests asserted by the defendants, those interests do not overcome the contributions that Fusaro and other citizens who are not registered to vote in Maryland could make to the body politic with registered voter lists. *Fusaro*, 930 F.3d at 256. *Anderson-Burdick* balancing tips in Fuaro's favor, and this Court should rule that the registered voter requirement in Section 3-506 is unconstitutional.

### III.   The "Electoral Process" Restriction is Unconstitutional Under the First Amendment

"Unlike the statutory provisions challenged in . . . *Anderson*, [the law] does not control the mechanics of the electoral process. It is a regulation of pure speech. Moreover, even though this provision applies evenhandedly to advocates of differing viewpoints, it is a direct regulation of the content of speech." *McIntyre*, 514 U.S. at 345 (footnote omitted) (citing 460 U.S. 780). The "electoral process" restriction can implicate one's access to a list under Section 3-506(a). Although it has only happened once in the last decade or so, the SBE can withhold—or, at least, has withheld—a list it believes may be used for purposes not related to the electoral process. *See generally* Exh. 4; *see also infra* part IV. However, in regards to use of the list once one has it, the "electoral process" restriction in both the oath provision and use provision in Section 3-506(c) are regulations of pure speech, content-based restrictions that do not satisfy strict scrutiny or the vagueness doctrine.

### A.   The "Electoral Process" Limitations Are Unconstitutional Content-Based Restrictions

Though "electoral process" has no definition, on its face Section 3-506 is content-based. Whether one's use of the list is for "any . . . purpose not related to the electoral process", or so related, "depend[s] entirely on the communicative content" of that use, or what one says to

Maryland registered voters via the list. *Reed*, 135 S. Ct. at 2227; *see also Fusaro*, 930 F.3d at 256 (noting the law contains content-based restrictions). This is confirmed by the SBE's informal enforcement of the law against Catalist, which focused on the content of letters mailed by one of its clients, the AARP. *See* Exh. 4.[4] Moreover, the OSP and the SBE agree that the provision (along with the prohibition on using the list for "commercial solicitation") prevents certain "outreach, marketing, solicitation (commercial or otherwise), or polling." Exh. 6 (answer to OSP interrogatories #s 4, 5); Exh. 3 (answer to SBE interrogatories #s 7, 8). Finally, though declining to answer whether Fusaro's letters would relate to the electoral process, the SBE's 30(b)(6) designee conceded that the content of each is at least part of the analysis. *See* SBE Depo., Exh. 2 at 32-33, 47-48. The "electoral process" restriction is a content-based restriction of speech.

Content-based restrictions are subject to strict scrutiny, ""'"which requires the Government to *prove* that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest[.]"'"" *Reed*, 135 S. Ct. at 2231 (quoting *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011) (quoting *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010))) (emphasis added). Rather than assert any actual governmental interests, in discovery the defendants simply tried to repackage censorship as a governmental interest:

> By limiting use of its voter lists to Maryland registered voters who agree to use it only for purposes "related to the electoral process," Maryland reduces the number of *potential reasons* for which a voter's personal information might be requested from the State Board (in the form of a list of registered voters), and the number of *potential reasons a voter might be contacted* through accessing the voter's personal information (via a list of registered voters).

_____

[4] In the other instance of informal enforcement, in which the SBE advised a Maryland registered voter that a copy of the list posted online "could be in violation of the law", it was publishing the content of the list itself that was at issue. *See* Exh. 3 (response to SBE interrogatory #6).

Exh. 3 (response to SBE interrogatory #7); Exh. 6 (response to OSP interrogatory #4) (emphasis added). This is alleged to be "privacy," but is in fact only privacy *from* certain "outreach, marketing, solicitation (commercial or otherwise), or polling." *Id.* That is, it is only privacy from certain content. As discussed in the previous section, the information in a registered voter list is all publicly available, just not so conveniently, thus Maryland registered voter information is not objectively private. *See supra* part II. Furthermore, the "electoral process" restriction applies to everyone who has the list, proving that privacy per se is not the purpose of the regulation (since list holders have the information) but rather preventing list holders from saying certain things to Maryland registered voters via the list. *See Reed*, 135 S.Ct. at 2230. By shielding registered voters from certain messages via the list, the defendants believe Marylanders will be encouraged to register to vote or to maintain their voter registration. Exh. 3 (response to SBE interrogatory #7); Exh. 6 (response to OSP interrogatory #4). The proof offered for this is "15 to 30 complaints from voters per year" out of more than four million registered voters. Exh. 3 (response to SBE interrogatory #7).

If these are governmental interests to begin with, they are not narrowly tailored. Encouraging Marylanders to register to vote or maintain their voter registration is laudable, but may be accomplished in any number of ways without censorship. The SBE could instead embark on an educational effort to inform citizens of the number of Maryland laws that protect them as consumers, remedying the alleged dangers of disclosing their voter registration data. *See, e.g.*, C.L. §§ 8-301, 3-803. Or the SBE might simply elect to educate the few complainants about "civic courage." *See John Doe No. 1 v. Reed*, 561 U.S. 186, 228 (2010) (Scalia, J. concurring). These are less restrictive means than the "electoral process" restrictions. Both of these restrictions are

content-based abridgements of speech, and the Court should rule them unconstitutional under the First Amendment.

### B.  Alternatively, "Electoral Process" Is Unconstitutionally Vague

Discovery has proven that the electoral process provisions are content-based restrictions on speech, and they may be struck down on that basis. But they are also void for vagueness. A statute is void for vagueness when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). Fusaro aptly summarized this concern in his deposition:

> So that's the conflict that people have. The written rules and what the U.S. Supreme Court says versus what the guy with the guns and the badges says. [To opposing counsel:] Because they get paid, like you get paid, off -- by taxpayer dollars. Yes, even my taxpayer dollars in Virginia because you guys get federal subsides [sic] from my tax dollars. So you get to come and screw with people's lives and say ["]you didn't follow the law.["] *Yet the man himself didn't even say what the law said.*
>
> Excuse me. I get a little passionate about it because we're talking about fundamental freedoms here.

Fusaro Depo., Exh. 7 at 49 (emphasis added). The SBE largely defers to the OSP when it comes to prosecuting violations of the electoral process restrictions, the SBE's soft enforcement of the provisions notwithstanding. But the OSP has declined to provide any detail whatsoever as to what "electoral process" means, or whether Fusaro's letters fit the bill. Exh. 6 (responses to OSP interrogatory #3, requests for admission #1, #2). Owing to this, Fusaro still does not know what is prohibited by the law and what is not. Fusaro Decl., ¶¶2-4.

State Prosecutor Howard was asked to admit that "Dennis Fusaro's second letter regarding the State Prosecutor, Dkt. 41-3, if delivered using addresses drawn from a registered voter list obtained via Md. Code Ann., Elec. Law § 3-506(a), would violate Md. Code Ann., Elec. Law § 3-

506(c)[,]" the misdemeanor provision of the law. Exh. 6 (response to OSP request for admission #2). In pertinent part, State Prosecutor Howard responded as follows:

> Defendant [State Prosecutor Howard] further neither admits nor denies whether he would prosecute Mr. Fusaro for using a Maryland list of registered voters obtained via Elec. Law § 3-506(a) to send the letter at Dkt. 41-3, because that determination depends on *numerous other factors* not addressed by the abstract hypothetical presented in the request.

*Id.* (emphasis added). These "numerous other factors" are, at best, privileged, or left to the prosecutor's discretion or a jury somewhere, someday. *Id.* Wherever these numerous factors lie, they are found nowhere in Maryland law. This does not relieve, but only heightens, the danger that the "electoral process" restriction will be enforced with serious discrimination. Other than the factual record, the vagueness of "electoral process" has been fully briefed previously, and Fusaro incorporates those arguments by reference. Dkt. 17-1 at 9–11, Dkt. 21 at 16–21.

"That [a] Court will ultimately vindicate [a speaker] if his speech is constitutionally protected is of little consequence—for the value of a sword of Damocles is that it hangs—not that it drops." *Arnett v. Kennedy*, 416 U.S. 134, 231 (1974). In the American tradition, the First Amendment protects the people against the government and it "does not leave us at the mercy of *noblesse oblige*." *U.S. v. Stevens*, 559 U.S. 460, 480 (2010). The OSP has never prosecuted a violation of the electoral process restrictions; this only speaks to the law's power to keep speakers in line and to maintain a level of exclusivity to part of Maryland's political sphere. Fusaro, as an outsider, just might be the first to be prosecuted. That the difference between free speech and felonious speech is left to prosecutors and juries under Section 3-506 is enough of an unconstitutional calamity; that the OSP so willingly embraces it is all the more reason for this Court to strike down the "electoral process" restrictions as unconstitutionally vague.

IV.    **The "Electoral Process" Restriction Unconstitutionally Prevents Third Party Access**

Whether this Court determines that the *Anderson-Burdick* analysis favors the state or not, it bears considering how the content restriction or vagueness of "electoral process" jeopardizes access—including Fusaro's—to a registered voter list via third parties who acquire a list under Section 3-506.[5] Concededly, in earlier briefing Fusaro's counsel erroneously compartmentalized the access and vagueness issues. *See* Dkt. 21 at 21. But the Court's application of the public records doctrine, particularly *United Reporting* and its progeny, brought the issue into focus. *See* Dkt. 26 at 24–26; 528 U.S. 32. Discovery, likewise, has shown that outright censorship or the Sword of Damocles hangs over anyone who might provide Fusaro the list for purposes of sending his letter, and Fusaro himself for seeking a list from any third party. *See* Fusaro Decl., ¶4.

In the earlier dismissal of this case, the court distinguished *United Reporting* and other cases strictly about access to government records from *Sorrell v. IMS Health, Inc.* 564 U.S. 552 (2011). "Notably, Fusaro's suit is . . . different from *Sorrell*, where the state had 'imposed a restriction on access to information in private hands.'" Dkt. 26 at 25 (quoting *Sorrell*, 564 U.S. at 568). But the "electoral process" restriction is not severed when a list in private hands is given or sold to a third party. By its terms, Section 3-506 penalizes "*knowingly* allow[ing] a list of registered voters, under the person's control, to be used for any purpose not related to the electoral process[.]" E.L. § 3-506(c) (emphasis added). And the oath required by the SBE is a broader prohibition that is penalized independently under the Maryland perjury statutes:

---

[5] "[T]he crucial consideration in assessing the propriety of a restriction on access to government information is whether it represents, *or poses a substantial risk of*, viewpoint discrimination." *Fusaro*, 930 F.3d at 263 (emphasis added).

> I am aware that, if I use the list for commercial solicitation or for any other purpose not related to the electoral process, *or make the list available to the public or third parties or publish or republish the list in a way that allows it to be used in that manner*, I will be guilty, upon conviction of a misdemeanor and subject to punishment under Election Law Article, Title 16 . . . .

Exh. 1 (emphasis added); *see* E.L. §§ 3-506(a)(1)(ii), § 16-501(a), (c); C.L. § 9-101(b). Without knowing what "electoral process" means—or, even if it is simply recognized as a content restriction—third parties are jeopardized by merely making available lists that are already in their possession if they are used in a way that does not meet what the defendants say it means on a given day. Moreover, Fusaro would be jeopardized for suborning perjury. E.L. § 16-501(b), (d); C.L. § 9-102(b); Fusaro Decl., ¶5.

Discovery revealed that the SBE tends toward enforcing, however informally, the oath it requires under pursuant to Section 3-506(a)(1)(ii). Indeed, just posting a registered voter list online is "not part of its purpose" and could violate the electoral process restriction. SBE Depo., Exh. 2 at 42. This Court noted in the *Judicial Watch* case that

> defendants . . . claim that '[E.L.] § 3-506(a) … does not preclude the recipient from sharing the list with other persons who do not meet Maryland's registered voter requirement.' . . . That is, a Maryland voter may request and obtain a voter list and immediately transfer it to Judicial Watch."

2019 WL 4168870 at *16. This might be true for Judicial Watch, which is seeking the list to investigate electoral integrity. *Id.* at *2–*3. But no citizen can say for sure, and the defendants in this matter have declined to say until they bring a case. *See, e.g.*, Exh. 6 (response to OSP requests for admission #2, #3).

The "electoral process" restriction abridges not only Fusaro's use of a list, but all potential avenues of access from third parties. This restriction is placed upon the list itself, not on the information therein, which is made available without restriction under both Maryland and federal

law. If *Anderson-Burdick* balancing does not favor Fusaro—which it weightily does—the unconstitutional prohibitions and vagueness of the "electoral process" provisions leave both the use *and access* provisions of Section 3-506 unconstitutional.

## CONCLUSION

For the foregoing reasons, this Court should enter declaratory judgment that the registered voter requirement in E.L. § 3-506(a)(1) and the "electoral process" restrictions in E.L. § 3-506(a)(1)(ii)(2) and (c) are unconstitutional.

Respectfully submitted,

DENNIS FUSARO

By his attorneys,

/s/ Stephen R. Klein
Stephen R. Klein (Pro Hac Vice)
Benjamin Barr (Pro Hac Vice)
PILLAR OF LAW INSTITUTE
455 Massachusetts Avenue NW
Ste. 359
Washington, DC 20001-2742
202.804.6676 [Tel.]
stephen.klein@pillaroflaw.org
benjamin.barr@pillaroflaw.org

John R. Garza (Federal Bar # 01921)
GARZA LAW FIRM, P. A.
Garza Building
17 W. Jefferson Street
Ste. 100
Rockville, MD 20850
301.340.8200, Extension 100 [Tel.]
jgarza@garzanet.com

Dated this 20th day of December, 2019.