IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DENNIS FUSARO

*Plaintiff*,

v.

CHARLTON T. HOWARD III, *et al.*,

*Defendants*.

Civil Action No. ELH-17-3582

**MEMORANDUM OPINION**

This litigation involves a constitutional challenge under the First Amendment to a provision of Maryland's election law.  In particular, plaintiff Dennis Fusaro challenges § 3-506 of the Election Law Article ("E.L.") of the Maryland Code (2017 Repl. Vol.), which limits access to Maryland's list of registered voters (the "List") to Maryland residents who are also registered voters, and only for a use related to the "electoral process."  Fusaro, a Virginia resident, was denied access to the List because he does not live in Maryland and is not a Maryland registered voter.  He filed suit against the following defendants, in their official capacities, seeking declaratory and injunctive relief: Emmet Davitt, who was then the Maryland State Prosecutor; David McManus, as Chair of the Maryland State Board of Elections (the "SBE" or the "Board"); Patrick Hogan, as Vice Chair of the Board; and Board Members Michael Cogan, Kelley Howells, and Gloria Lawlah.  ECF 1 (the "Complaint").

The Maryland State Prosecutor serves pursuant to appointment by the Governor; the position is not an elected office.  As discussed, *infra*, Davitt previously prosecuted Fusaro for a Maryland campaign finance violation.  Fusaro was ultimately acquitted.  Fusaro sought a copy of the List in order to contact Maryland voters to complain about Davitt.

Notices of Substitution have since been filed as to various defendants. Davitt has been succeeded by Charlton T. Howard III (ECF 52); Cogan has replaced McManus as Chair of the SBE; William G. Voelp succeeded Cogan; and Lawlah was succeeded by Malcom L. Funn. ECF 44. I shall sometimes refer to the defendants collectively as the "State."

## I. Procedural Summary

Count I of the suit concerns access to the List. Fusaro alleges that E.L. § 3-506(a)(1) is unconstitutional, both facially and as applied to him, because it provides that only a "Maryland registered voter" may obtain a "copy of a list of registered Maryland voters . . . ." ECF 1, ¶ 27. Therefore, he contends that the statute "selectively advantages some political speakers and disadvantages others." *Id.* ¶ 30. Fusaro maintains that his "voice in Maryland politics may not be selectively silenced simply because he is not a registered voter" in Maryland. *Id.* ¶ 32.

Count II of the suit concerns use of the List. Fusaro claims that E.L. §§ 3-506(a)(1)(ii) and (c) create an unconstitutional restriction on speech. In this regard, he points out that E.L. § 3-506(a)(1)(ii) requires a Maryland registered voter requesting the List to make a "statement, signed under oath, that the list is not intended to be used for . . . any . . . purpose not related to the electoral process", and E.L. § 3-506(c) provides: "A person who knowingly allows a list of registered voters, under the person's control, to be used for any purpose not related to the electoral process is guilty of a misdemeanor . . . ." According to Fusaro, the provision prohibits use of the List for "constitutionally-protected political speech . . . ." *Id.* ¶ 36. He also contends that the phrase in E.L. § 3-506(c), "not related to the electoral process" is "unconstitutionally vague, facially and as applied . . . ." *Id.* ¶ 40. And, he claims that E.L. § 3-506 "threatens [him] with prosecution for forbidden uses of the registered voter list that cannot be readily determined." *Id.*

By Memorandum Opinion (ECF 26) and Order (ECF 27) of September 4, 2018, I denied Fusaro's motion for preliminary injunction and granted defendants' motion to dismiss the suit, concluding that Fusaro had not stated a claim under the First Amendment. *See Fusaro v. Davitt*, 327 F. Supp. 3d 907 (D. Md. 2018). In large measure, I concluded that the First and Fourteenth Amendments do not mandate a right of access to information generated or controlled by government. ECF 26 at 17 (citing cases); 327 F. Supp. 3d at 918. Therefore, I did not reach Fusaro's vagueness contention. ECF 26 at 27.

On appeal, the Fourth Circuit vacated and remanded. *Fusaro v. Cogan*, 930 F.3d 241 (4th Cir. 2019). The Court determined that Fusaro stated a claim under the First Amendment, but concluded that his claims are not subject to strict scrutiny. Therefore, it instructed this Court "to conduct the balancing of interests test required by the *Anderson-Burdick* framework." *Id.* at 263. *See Burdick v. Takushi*, 504 U.S. 428 (1992); *Anderson v. Celebrezze*, 460 U.S. 780 (1983). And, the Fourth Circuit directed this Court to consider plaintiff's vagueness challenge. *Fusaro*, 930 F.3d at 264.

Following the remand, the parties engaged in discovery. Thereafter, upon completion of discovery, Fusaro moved for summary judgment (ECF 53), supported by a memorandum of law (ECF 53-1) (collectively, the "Fusaro Motion"), and several exhibits. ECF 53-2 to ECF 53-12. The State filed a combined opposition and cross-motion for summary judgment (ECF 56), supported by a memorandum of law (ECF 56-1) (collectively, the "State Motion"). The State also submitted several exhibits. ECF 56-4 to ECF 56-11; ECF 58. Plaintiff's Reply is docketed at ECF 59. The State's Reply is found at ECF 60.

In addition, Fusaro has moved to file a supplemental complaint (ECF 41), supported by a memorandum of law. ECF 41-1 (collectively, the "Supplemental Complaint Motion"). The

proposed Supplemental Complaint is docketed at ECF 41-2.  The Supplement Complaint Motion is unopposed.

The proposed Supplemental Complaint is largely the same as the initial Complaint.  Like the original Complaint, it contains two counts.  In Count I, concerning access to the List, plaintiff alleges that E.L. § 3-506(a)(1) violates the First and Fourteenth Amendments to the Constitution. And, in Count II, concerning use of the List, Fusaro alleges that E.L. §§ 3-506(a)(1) and (c) are unconstitutional because they limit use of the List to purposes related to the electoral process.

As to Count I of the Complaint, which Fusaro expressly incorporates into his Supplemental Complaint (ECF 41-2, ¶ 27), Fusaro reiterates that, "[b]y limiting access to the registered voter list to Maryland registered voters, E.L. § 3-506(a)(1) selectively advantages some political speakers", *i.e.*, Maryland registered voters, "and disadvantages others", *i.e.*, those who are not Maryland registered voters.  ECF 1, ¶ 30.  As to Count II, which incorporates the original Count II (ECF 41-2, ¶ 34), Fusaro claims that he "would like to share his story with Maryland citizens [about being prosecuted and acquitted for alleged violations of Maryland campaign finance laws], express his frustration with the Maryland State Prosecutor and encourage Marylanders to echo his concern by encouraging Davitt to resign."  ECF 1, ¶ 2. Further, Fusaro asserts that he would like to communicate with Maryland citizens "via U.S. Mail with letters addressed to certain Maryland registered voters, drawing [names and contact information] from Maryland's registered voter list."  *Id.* ¶ 3.  And, he states that he would like to "share details of his appellate victory in this matter . . . and, due to the resignation of State Prosecutor Davitt, encourage Marylanders to 'send a message to Davitt's replacement' to uphold his or her oath of office."  ECF 41-2, ¶ 3.1.

No hearing is necessary to resolve the motions.  *See* Local Rule 105.6.  For the

reasons that follow, I shall grant plaintiff's Supplemental Complaint Motion.  I shall also grant the State Motion.  And, I shall deny the Fusaro Motion.

## II.  Factual Background[1]

### A.

As of November 1, 2019, there were more than 4.2 million Maryland registered voters. ECF 53-7 (Defendants' answers to discovery requests) at 4.   E.L. § 3-506(a) governs dissemination of Maryland's List of registered voters.  *See also* Code of Maryland Regulations ("COMAR") 33.03.02.  The List is drawn from a statewide database known as MDVoters.  *See* ECF 53-6 (DeMarinis Deposition) at 4, Tr. 16-17; *Judicial Watch, Inc. v. Lamone*, ELH-17-2006, ___ F. Supp. 3d ___, 2020 WL 1904701, at *2 (D. Md. Apr. 17, 2020).  It includes a voter's name, address, party affiliation, and voting history.  ECF 53-6 at 4, Tr. 17.[2]  A Maryland registered voter may obtain the List for $125 and, for an additional $3.00, the List is provided on a compact disc ("CD").  ECF 53-1 at 3.

The Board oversees the administration of elections in Maryland, as well as compliance with E.L. § 3-506.  *See* ECF 20-1 at 11; ECF 44.  Between January 2010 and November 2019, the Board received about 1,100 applications for the List.  ECF 53-7 at 5.  It rejected only 23 of those requests, *id.* at 6, either because of lack of payment or because the applicant was not a Maryland registered voter.  ECF 53-6 at 5, Tr. 21.

---

[1] The facts are largely undisputed.   I incorporate here the facts set forth in my earlier opinion, as supplemented by the new factual material submitted by the parties with their summary judgment motions.

[2] In *Judicial Watch v. Lamone*, __F. Supp. 3d__, 2020 WL 1904701 (D. Md. Apr. 17, 2020), the Court considered whether the National Voter Registration Act of 1993, 52 U.S.C. § 20507(i), requires disclosure of voter birth dates, because they are part of the information in the Maryland database and are not shielded under Maryland law.   The Court concluded that disclosure is required.  *Judicial Watch*, 2020 WL 1904701, at *14.

E.L. § 3-506 contains "four conditions on access to a copy of the List." *Fusaro*, 930 F.3d at 246 (citing E.L. §§ 3-506(a), (c)). In particular, "the requester must: be a registered Maryland voter; complete an application that requires providing a home address; pay a fee; and refrain from using the List for any purpose not related to the electoral process." *Id.*

The statute provides, in part:

**§ 3-506.  Copies of list.**

(a) *Providing—Registered Voter.*— (1) A copy of a list of registered voters shall be provided to a Maryland registered voter on receipt of:
    (i) a written application; and
    (ii) a statement, signed under oath, that the list is not intended to be used for:
        1. commercial solicitation; or
        2. any other purpose not related to the electoral process.

\*    \*    \*

(c) *Prohibited act and penalties.*—A person who knowingly allows a list of registered voters, under the person's control, to be used for any purpose not related to the electoral process is guilty of a misdemeanor and, on conviction, is subject to the penalties under Title 16 of this article.

Regarding the oath, Code of Maryland Regulations ("COMAR") 33.03 02.04 states:

The application shall contain an affidavit, signed by the applicant, in substantially the following form:

Under the penalties of perjury, I declare that no part of any list requested by this application is intended to be used for commercial solicitation or for any other purpose that is not related to the electoral process.

I am aware that if I or any other person who has a registration list under his or her control knowingly allows any part of that list to be used for commercial solicitation or for any other purpose that is not related to the electoral process, that individual is guilty of a misdemeanor and, on conviction, subject to imprisonment for not less than 30 days or more than 6 months, to a fine of up to $250, or to both imprisonment and fine.

E.L. § 16-1001(a) is titled "**Misdemeanor for which no penalty is specified**." It states:

"A person convicted of a misdemeanor under this article for which no penalty is specifically provided is subject to a fine of not less than $10 nor more than $250 or imprisonment for not less

than 30 days nor more than 6 months or both." *Id.* E.L. § 16-501 is titled "**False oath or affirmation**." Section 16-501(a) states: "*In general.*—A person may not willfully and falsely take an oath or affirmation prescribed (1) by the State Board; or (2) pursuant to this article." And, E.L. § 16-501(c) states: *Penalty for perjury.*— "Any person who violates subsection (a) of this section is guilty of perjury and shall be punished according to the laws of the State for perjury." Pursuant to Md. Code (2012 Repl. Vol.), § 9-101(b) of the Criminal Law Article ("C.L."), perjury is a misdemeanor that, upon conviction, shall result in "imprisonment not exceeding 10 years."

Significantly, E.L. § 3-505(b), titled **"Public inspection"**, makes voter registration records "open to public inspection" at local SBE offices. E.L. § 3-505(b)(1). And, under E.L. § 3-505, there are no restrictions on who may obtain voter registration records, nor is there any fee to obtain the information. *See Fusaro*, 930 F.3d at 260.

As the Fourth Circuit observed in *Fusaro*, *id.*, "[t]he List itself does not convey any message or idea, and the limits placed on access to it do not directly impede the flow of information" because "other means of communication remain open." Indeed, "[a]ccess to the List . . . is *several* steps removed from . . . democratic participation. In short, the List remains a useful tool for communication but not a form of actual speech." *Id.* (emphasis in *Fusaro*).

## B.

When Fusaro filed suit, Davitt was the Maryland State Prosecutor, a position established by Title 14 of the Criminal Procedure Article ("C.P.") of the Md. Code (2008 Repl. Vol., 2017 Supp.). The Office of the State Prosecutor is an independent unit within the Office of the Maryland Attorney General. C.P. § 14-102(a)(2). The State Prosecutor is appointed by the Governor, with the advice and consent of the Maryland Senate. C.P. § 14-102(a)(1). The State Prosecutor is empowered to investigate and prosecute, *inter alia*, "a criminal offense under the

State election laws" and "a violation of the State . . . perjury . . . laws related to an activity described in this paragraph . . . ." C.P. §§ 14-107(a)(1)(i), (a)(1)(v), 14-109(a).

In 2014, Fusaro worked as "campaign manager and consultant" to the successful campaign of Michael Anthony Peroutka, who was running for a seat on the Anne Arundel County Council. *See* ECF 20-2 at 5; ECF 53-11 at 6, Tr. 30-31 (Deposition of Fusaro); *see also* ECF 20-2 (Criminal Summons and Information forms of Dennis Fusaro, District Court of Maryland for Anne Arundel County, dated April 13, 2016) at 5; ECF 1, ¶ 16.

On or about October 31, 2014, Fusaro allegedly caused "the publication and distribution of more than 5,000 automated telephone calls regarding Patrick Armstrong, the candidate opposing Michael Anthony Peroutka for the Office of Anne Arundel County Council in the 2014 General Election. . . ." ECF 20-2 at 5. The robotic telephone calls contained the following message, *id.* at 5-6:

> Hello, what a great opportunity for the LGBT community. We have a true believer for our cause in Patrick Armstrong who's running for County Council in Anne Arundel County, Maryland. Call Patrick today and thank him for his bravery in coming out of the closet. Coming out of the closet and supporting the fairness to all Marylander's [sic] Act, the Maryland State Senate Bill 212, and supporting the rights for all transgenders. Transgenders can now openly and freely go into any bathroom of their choice based on their confused gender identity. Tell Patrick to continue to stand loud and proud in support for transgenders' equal rights. While our opponent argued that children could be at risk by sexual predators with this new law, we celebrate the rights of transgenders and what this does for equality for transgenders in Maryland. Call him today at [phone number redacted] and thank him for supporting the bathroom bill. Paid for and authorized by Marylander's [sic] for Transgenders.

On April 13, 2016, Fusaro was criminally charged in the case of *State of Maryland v. Dennis Fusaro*, D-07-CR-16-734 (Dist. Ct. Md. Anne Arundel Cty.) with violations of E.L. §§ 13-602(a)(9) and 13-401. *See* ECF 20-2 at 3, 5-7. E.L. § 13-602(a)(9) states, *id.*: "A person may not publish or distribute, or cause to be published or distributed, campaign material that

violates § 13-401 of this title."   E.L. § 13-401 requires, *inter alia*, that campaign materials provide the name and identity of the person or entity responsible for publishing or distributing those materials.  *See* E.L. §§ 13-401(a)(1), (a)(2), (a)(3), (b).

In his Complaint, Fusaro recounts that "[o]n February 21, 2017, [he] was convicted in a bench trial" in the District Court for Anne Arundel County "for failure to include a campaign finance disclaimer on an automated phone call that cost under $100 to facilitate. . . .  He was sentenced to 30 days in jail and a $1,000 fine."  ECF 1, ¶ 1; *see also State v. Fusaro*, D-07-CR-16-000734 (D. Ct. Md. Anne Arundel Cty. Feb. 21, 2017).  Thereafter, Fusaro noted a de novo appeal to the Circuit Court for Anne Arundel County.  *Id.*  On August 3, 2017, a jury in the Circuit Court for Anne Arundel County acquitted Fusaro of the charges.  ECF 1, ¶ 1; *see State v. Fusaro*, C-02-CR-17-000351 (Cir. Ct. Md. Anne Arundel Cty. Aug. 3, 2017).

An editorial subsequently appeared in the Capital Gazette, a newspaper in Annapolis, titled "Prosecutor was right to bring robocall case."  ECF 56-5 at 2.  Noting that Fusaro had been acquitted by a jury, the editorial, said, in part, *id.* at 2-3:

> But whatever self-serving nonsense Fusaro and Waters dredge up, it is not unreasonable, let alone a plot to enforce "the establishment agenda," to require that Marylanders be clearly told where a paid campaign ad came from. It's the minimum that can be done in an era when it's easy for misleading and dishonest material to get traction on social media.
>
> Soon robocalls may be scorned as hopelessly old school. But in the meantime prosecutors like Davitt should do their best to uphold the state's laws. This will hardly end electoral dirty tricks, which have been around as long as elections. But having some basic rules to promote fairness is better than having none.

On August 24, 2017, a few weeks after Fusaro's acquittal, Fusaro submitted to the SBE an Application for Voter Registration Data (ECF 1-2 at 2) (hereinafter, the "Application"), requesting a copy of the List, on a CD.  *Id.*  The Application contains an oath that provides, in part, *id.*: "Under penalty of perjury, I hereby declare, as required by Election Law Article, § 3-

506, *Annotated Code of Maryland*, that **the list of registered voters for which I am applying is not intended to be used for commercial solicitation or for any other purpose not related to the electoral process**. . . .”   (Bold and italics in original).   Fusaro stated that he is a Virginia resident.   ECF 1-2 at 2.   He signed the Application, indicating that he read and understood the oath, and submitted payment by money order, in the total amount of $128.   *Id.* at 2-3.

The Board received the Application (ECF 1-3) on August 28, 2017.   *Id.*   It bears the word “REJECTED” and the initials “EWD” in red.   And, the following words on the Application are circled in red: “Must be a Registered Maryland Voter.”   *Id.*

Email correspondence between Fusaro and Erin W. Dennis, a Board employee, dated September 4, 2017 and September 6, 2017, indicates that the initials “EWD” on the Rejected Application are those of Ms. Dennis.   *See* ECF 1-4 (emails between Fusaro and Ms. Dennis).   In the email correspondence, Ms. Dennis informed Fusaro that his Application “was rejected because [one] must be a Maryland resident and registered voter to request a copy of the [Maryland] voter registration list.”   *Id.*   As indicated, Fusaro is a resident of Virginia.   ECF 1, ¶¶ 4, 9.

Fusaro submitted with his suit a copy of the document he wanted to mail to certain Maryland registered voters once he obtained access to the List.   *See* ECF 1-1 (the “Letter”).   The Letter stated, in part, *id.* (emphasis added):

> Dear Maryland Citizen,
>
> You are the ultimate maker of public policy in the State of Maryland.   You may or may not vote in State-level elections in the “Free State” but your voice can and should be heard when it comes to the way public officials behave in office.
>
> *       *       *
>
> One example of the failure to uphold the principles of both the U.S. and Maryland Constitutions can be found in the person of the Maryland State Prosecutor, a man

named Emmett C. Davitt.

Davitt was appointed to this office, and his term expired in 2016, but he has remained in that office in so-called "holdover" status. He continues to collect his taxpayer-funded salary and attack First Amendment free speech rights under the color of law.

I experienced this censorship first hand. *I was charged with violating state campaign finance laws* for a speech communication that cost under $100. Davitt wanted me to serve thirty (30) days in jail for speaking out. Thankfully, a jury of my peers found me not guilty in my second trial. Davitt's next target may not be so lucky.

As a Maryland government official, Davitt breaks the law by misusing his power to infringe on constitutionally-protected individual free speech rights. He acts under the "color of law" to violate the law and disobey the oath he swore to uphold and defend the U.S. and Maryland Constitutions against all enemies foreign and domestic. In fact, he himself has become an enemy of the Constitution and the rule of law.

Please call Davitt at . . . (toll free) or email him at . . . .

Ask him to do the right thing. Tell him to resign.

To be sure, the Letter stated that Fusaro was prosecuted for allegedly "violating state campaign finance laws" (ECF 1-1) in relation to his work as campaign manager and consultant for Peroutka's 2014 general election campaign.  ECF 20-2 at 5.  But, Fusaro concedes that the Letter "has nothing to do with an election" and that the Letter is "not related to the electoral process."  ECF 1, ¶¶ 5, 26.  In particular, he contends that "Davitt is an appointed official, thus Fusaro's letter does not . . . call for Davitt's election or defeat . . . ."  *Id.* ¶ 35.

As noted, Davitt no longer serves as the State Prosecutor.  In light of the appointment of his successor, Fusaro submitted an updated letter with his Supplemental Complaint.  ECF 41-3 at 2 (the "Updated Letter").  Fusaro seeks to send this letter "via U.S. mail. . . to certain Maryland registered voters, drawing from Maryland's registered voter list.  ECF 41-2, ¶ 3.2.  The Updated Letter states, in part, ECF 41-3 at 2:

Dear Maryland Citizen,

You are the ultimate maker of public policy in the state of Maryland. As a registered voter you may or may not vote in state-level elections in the "Free State" but your voice can and should be heard when it comes to the way public officials - elected or appointed - behave in office.

If you don't speak up and speak out, these officials will often act according to their own self-interest rather than in pursuit of Constitutional Principles and the oaths they've sworn to uphold them.

I experienced this first hand. I was charged with violating state campaign finance laws for a speech communication that cost under $100. State Prosecutor Emmet Davitt wanted me to serve thirty days in jail for speaking out. Thankfully, a jury of my peers found me not guilty in my second trial.

I wanted to tell you about this when it happened two years ago, but I ran into another problem: Maryland law prevented me from buying a copy of the state's registered voter list and, even then, threatened me with another prosecution if I used the list to tell you about my ordeal. I had to go to court yet again - all the way to the Fourth Circuit Court of Appeals - just to make a First Amendment case out of it.

With so many laws like this, Maryland government officials like Davitt can abuse their power to infringe on constitutionally-protected free speech rights. They can act under the "color of law" to disobey the oaths they swore to uphold and defend the U.S. and Maryland Constitutions against all enemies foreign and domestic. Too many public officials have become enemies of the Constitution and the rule of law.
State Prosecutor Davitt retired on August 1, 2019. Will his replacement be any better?

Please call the State Prosecutor's Office at . . . (toll free). Send a message to Davitt's replacement.

At his deposition on November 1, 2019 (ECF 58), Fusaro indicated that he originally wanted to send voters the Letter concerning Davitt because Davitt "made a statement after [Fusaro's] trial that they would keep going after people." *Id.* at 16.  He explained that he seeks to send the Updated Letter because "there's a risk that his previous example may be adopted by the current State prosecutor who may wish to continue his tyrannical policy of prosecuting free speech in Maryland in violation of the U.S. Constitution and Supreme Court precedent." *Id.* at

12

45.  He agreed that his purpose in sending the Updated Letter was to "send a message to the new State prosecutor to stay true to constitutional principles."  ECF 53-11 at 19, Tr. 109.

Further, Fusaro testified: "And politicians listen most carefully when their job is on the line.  And so the voter list is a tool that people who can impact their behavior on public policy— it's a tool that everybody uses."  ECF 58 at 9.  Fusaro asserted that elected officials use "the voter list to communicate their ideas, their concerns, their concepts about the public policy of Maryland and it's not being done for—what's the term—election purposes, related to the electoral process. . . ."  *Id.* at 10.

Additionally, Fusaro explained that he "just want[s] the same right to talk to people" as Maryland voters enjoy.  *Id.* at 11.  He stated: "I travel through Maryland, I might own property some day in Maryland, I might go hunting in Maryland.  And so what Maryland public policy does affects me . . . . I might want to change public policy."  *Id.*

According to plaintiff, he is seeking "the same right that a registered voter in Maryland has," and he asks:  "[W]hy do they [*i.e.*, Maryland registered voters] get to buy that list for 125 bucks, but I'm being told in your filings that I should go out into the marketplace and buy it from someone like Aristotle or Democracy Data or L2 Lists and I should pay more money than $125 than a Maryland registered voter."  *Id.* at 11-12.  Fusaro characterized this price as a "tax."  *Id.* at 12.  He also described his inability to obtain the List to discuss public policy as "discriminatory." *Id.*  And, he disclaimed any commercial purpose for requesting the List.  *Id.* at 13.

Plaintiff also addressed his assertion that registered voters are his "best audience."  *Id.* at 20.  He said, *id.*:

> Because elected officials and/or appointed officials who derive their power from elected officials by and large to make public policy are most sensitive to those who can give them or take -- give to them or take away from them their power. That is their position in office. Politicians are people who want to have their hand

directly on the levers of power.

Fusaro explained that he wants to send letters to the voters who "would have the most impact and make [his] letter the most effective it could be." *Id.* at 22.  His criteria for selecting voters includes "look[ing] at the list and mak[ing] a determination. . . [b]ased on . . . what might have the most impact on a given official." *Id.* at 23.  He admitted that he "hadn't gotten [as] far" as identifying the particular voters he would target. *Id.* at 24.

According to Fusaro, when he first filed suit, he "might have been willing to spend several thousand dollars" to disseminate the Letter. *Id.* at 26.  But now, he is "[p]robably" only willing to spend "several hundred dollars" on the effort. *Id.* at 25.  He acknowledged that a substantial mailer, sent to about a million people, might cost around $500,000, and he is not willing to spend that sum of money. *Id.* at 26-27.

Fusaro acknowledged that has not considered alternative forms of communicating with Maryland voters. *Id.* at 27.  In his view, the List is the most reliable source of data. *Id.* at 51.  Moreover, he regards advertising in print media as "not effective." *Id.* at 27.  He is also skeptical about the effectiveness of online advertising. *Id.*  Although he considered social media advertising, it is not his "primary focus" because he is not sure elected officials would be responsive to out-of-state individuals. *Id.* at 29.  Nor does he want to pay for advertising via social media. *Id.* at 31.  And, he did not consider using a billboard to disseminate his message. *Id.* at 33.

Plaintiff is aware of the "Every Door Direct Mail" service by the United States Postal Service, which distributes mail to targeted areas, but he does not believe it is the optimal way of contacting voters. *Id.* at 31-33.  In Fusaro's view, blanket mailings are "scattershot," because they do not allow him to select "the kind of people that the public elected official or the—I

should say the appointed official, like Mr. Davitt in this case—would be responsive to in terms of changing their behavior in terms of public policy." *Id.* at 32. Rather, he is "comfortable right now with direct mail." *Id.* at 28.

Although Fusaro was aware of the editorial in the Capital Gazette, he did not respond to it. *Id.* at 36. Nor did he attempt to utilize campaign finance reports, which are publicly available and list the names and addresses of donors to campaigns. *Id.* at 37, 39. In his view, lists of donors are not "equal" to the List. *Id.* at 42. As he put it, "angry voters trump donors." *Id.* at 43. According to Fusaro, donors "have an interest in preserving the status quo because they're invested in a particular official and would be more resistant to hearing a message. . . ." *Id.* Nevertheless, he recognized that a list of donors to a challenger could "be a potential list" and he "might want both lists." *Id.* at 44. But, he expressed concern that a donor list could include people who cannot vote, thus diluting the utility of the list for his purposes. *Id.* He also had not considered obtaining "email lists," *id.* at 47, because he "wanted the real thing." *Id.* at 48.

In his Declaration (ECF 53-12), Fusaro avers that he has reviewed E.L. § 3-506 and does "not understand what is authorized or prohibited by the term 'related to the electoral process' in that statute." *Id.* ¶ 1. Further, he claims that he does not know whether the law prohibits him from sending either of his letters. *Id.* ¶ 2. Plaintiff also avers that, even after reviewing testimony and discovery responses from the State Prosecutor and the SBE, he still does "not understand what is authorized or prohibited by the term 'related to the electoral process.'" *Id.* ¶ 3. He expressed concern that he would be prosecuted for sending one of his letters. *Id.* ¶ 4. Because Fusaro fears prosecution, he claims that he will not seek a copy of the List from a third party. *Id.*

As noted, as of November 1, 2019, there were more than 4.2 million registered voters in

15

Maryland.  ECF 53-7 at 4.  And, of the approximately 1,100 applications for the List that the

Board received between January 2010 and November 2019, only 23 were rejected.  *Id.* at 5.

Defendants submitted the Affidavit of Charlton Howard III, who succeeded Davitt as the

Maryland State Prosecutor.  ECF 56-7.  Howard averred, *id.* at 2:

> It is my opinion that, given the statutory scheme regarding the independent
> selection and execution of the office of the State Prosecutor ["OSP"], and the
> consequent separation of the office from the electoral process, as detailed in
> Maryland Code, Criminal Procedure Article, Sections 14-101 – 14-114, it is
> extremely unlikely that a letter writing campaign to Maryland Registered Voters
> as contemplated by Mr. Fusaro would have any effect on the exercise of
> prosecutorial discretion by the State Prosecutor in any matter.

In response to Fusaro's discovery requests, Howard stated, ECF 53-10 at 6:

> [T]here is no formal or informal policy that guides the OSP's interpretation of
> Elec. Law § 3-506(c) for the purpose of investigating potential violations of, and
> enforcing, that statute. Defendant further states that, to date, the OSP has not
> prosecuted any person for violation of Elec. Law § 3-506(c) since January 1,
> 2010. Defendant further states that while he cannot disclose whether the OSP has
> investigated any person for violation of Elec. Law § 3-506(c) since January 1,
> 2010, to date, the OSP has not received any referral of any complaint relating to
> conduct potentially in violation of Elec. Law § 3-506(c) from the Maryland State
> Board of Elections (the "State Board"), the agency charged with administering the
> election laws of this state. Accordingly, to date, the OSP has not had occasion to
> "determine whether a use of a registered voter list is 'related to the electoral
> process'" in connection with any prosecution of any person for violation of Elec.
> Law § 3-506(c), or any referral of any complaint relating to a potential violation
> of Elec. Law § 3-506(c) by the State Board.

Howard reiterated that the State's purpose in limiting the use of the List to the "electoral

process" and prohibiting "commercial solicitation" is to protect the privacy of Maryland's voters

and to encourage voter registration.  *Id.* at 7-10.  Howard neither admitted nor denied Fusaro's

requests for admission that his Letter and Updated Letter violate E.L. § 3-506(c), because "that

determination depends on numerous other factors not addressed by the abstract hypothetical

presented in the request."  *Id.* at 11-12.  But, he stated that, to date, the OSP had not "prosecuted

any person for violation of Elec. Law § 3-506 simply for sharing a Maryland registered voter list,

16

free of charge, with other persons who do not meet the Maryland registered voter requirement." *Id.* at 13.

Jared DeMarinis, the Director of Candidacy and Campaign Finance at the SBE, testified as the Board's Rule 30(b)(6) deponent.[3]  He stated that once the Board receives a request for the List, the application is processed "within 48 hours" and the CD is created "within that day." ECF 56-9 (DeMarinis Deposition) at 7-8.  According to DeMarinis, the SBE annually receives between 75 to 150 applications for the List.  *Id.* at 8.  One or two of these applications are rejected every year, due to "lack of payment or not a registered voter."  *Id.* at 9; ECF 53-6 at 5, Tr. 21.

Employees at the SBE are tasked with reviewing applications for the List.  But, there are no internal documents at the Board with respect to the requirement limiting use of the List for electoral purposes.  ECF 56-9 at 9; ECF 53-6 at 6, Tr. 24-25.  Accordingly, the SBE has "not necessarily opined on commercial solicitation as a means of rejecting an application."  ECF 56-9 at 10.

DeMarinis noted that if a voter had questions about what constituted a permissible use of the List, the Board would provide guidance.  *Id.* at 14.  However, Fusaro's use of the List was not before the SBE; when he submitted the Application, he signed the oath that he would only use the list for an electoral purpose.  *Id.* at 15; ECF 1-2 at 2.

According to DeMarinis, the issue of use of the List for commercial purposes "would be an enforcement question, and that would be within the State Prosecutor's Office."  ECF 56-9 at 15.  He stated that, if a person were to sell the List to Fusaro with no knowledge of his purposes,

---

[3]  Fusaro has submitted transcripts of DeMarinis's testimony on July 31, 2017, from Fusaro's criminal proceeding.  ECF 53-9.  DeMarinis's testimony concerned campaign finance committees and authority line requirements for campaign materials.

whether that act violated the electoral process provision "would be a matter that would be referred to the State Prosecutor's Office as a violation of the oath, which was signed that they would not use the list in a manner not related to the electoral process." *Id.* at 11.  DeMarinis testified that to fall within "the definition of electoral process," a communication would "have to be within the arena to influence Maryland voters or part of the—I would say part of an election administration." *Id.* at 12.

DeMarinis was presented with a copy of a letter Fusaro seeks to send to Maryland voters, *id.* at 12, and was asked if Fusaro could be denied a copy of the List because the letter is not "used for purposes related to the electoral process[.]" *Id.* at 13.[4]  DeMarinis responded, *id.* at 13-14:

> Well, SBE would probably never see this letter. It would not be a part of the application for the voter registration data. So if the application was correct, meaning that the individual seeking the list was a Maryland registered voter and subsequently signed the oath, the State Board of Election would cease and distribute the list. If a complaint arose subsequent from that, I would say disbursement of the list, that complaint then would be referred to the State Prosecutor's Office at which point then the letter here would be in question about whether it would be part of the electoral process. But for the State Board of Election it's not like we ask for the list or what the intended purpose was at the time of the application. We ask for the application [to] be filled out, that it is signed under the penalties of perjury and that payment is satisfied for a hundred and twenty-five dollars for the statewide voter registration list. We do not ask for any subsequent materials as to its use or its -- for its use.

Further, DeMarinis stated, ECF 53-6 at 8, Tr. 30-31:

> I would say for this situation here that there were other administrative avenues in which Mr. Fusaro could have done himself in order to seek a determination that would be binding on the State Board of Election[s] that would be greater than verbal advice given. And that would be to -- prior to its release of this letter to seek a declaratory ruling from the State Board of Elections because that is from prospective process that Mr. Fusaro then can have himself bound by the facts and bind the State Board of Election[s] and the Local Board of Elections as to its interpretation of electoral process.

---

[4] It is not clear whether DeMarinis was given the initial Letter or the Updated Letter.

> Any opinion that I give would not bind the State Board of Election[s] and would be subject to more interpretation on that matter. So like I said, I think that if this came to us, I would have consulted with my attorney on this matter here because this is not black letter law, meaning that it's not as clear as a six-thousand-dollar contribution limit or with, I would say various Attorney General opinions backing up other portions of the law that we have in store so that we can make a determination. Since the State Board has never opined officially on electoral process, we would want to have more, I would say opinions behind it to see. And, of course, the first one would be presidency and thus would require at least consultation with the Attorney General's Office.

When asked if Fusaro's Letter fell within the electoral process requirement, DeMarinis responded: "My answer is it's the same process." *Id.*, Tr. 33. But, he indicated that a declaratory ruling would not be available "with regard to a statute that the State Board does not enforce." *Id.* at 11, Tr. 44. He also indicated that, in the preceding 18 years, the SBE staff could not recall any referrals to the State Prosecutor for violations of E.L. § 3-506(c). *Id.* at 12, Tr. 46.

DeMarinis was also asked about whether a legislator using the List to provide constituents with a legislative update would fall within the electoral process requirement. He responded, *id.* at 9, Tr. 34-35:

> It would depend on what entity was paying for the mailing. The campaign doing the mailing by definition would make that campaign material and be a part of the electoral process because it's trying to influence Maryland voters. If it's the government office that is doing it, then that would be legislative and outside the purview of the State Board of Election[s] to make a determination on that front because the State Board of Election[s] only regulates and administers the campaign activity. If it's as a legislator, they have certain rules that they have to abide by using government funds that is restrictive and outside of my knowledge. But if it's from the campaign being mailed out, then it's campaign material.

And, DeMarinis discussed informal enforcement mechanisms for misuse of the List, short of a referral to the State Prosecutor. *Id.* at 11, Tr. 42. He indicated that a person had posted the List online; SBE contacted the individual, who subsequently took down the information. *Id.* And, he agreed that the SBE received complaints from voters "about being contacted. . . based

on the availability of their voter information[.]" *Id.*  But, such complaints are not referred to the State Prosecutor. *Id.*, Tr. 45.

In response to an interrogatory from plaintiff, asking defendants to identify the government interests served by restricting access to the List, the State provided three reasons. ECF 53-7 at 7.  It claims that access to the List is restricted to safeguard the privacy of Maryland citizens, because the List contains "sensitive, personally identifiable information . . . all collected in a single file." *Id.*  The State noted that such a collection "could be valuable to any number of persons, organizations or business entities seeking to conduct outreach, marketing, solicitation . . . or polling." *Id.*  Further, the State cited its desire to "encourage Maryland residents to register to vote (or maintain their voter registration)." *Id.*  It reasoned, *id.* at 8: "If access to Maryland's registered voter lists were broadened to allow applicants who are not Maryland registered voters to obtain [the List], qualified individuals may be deterred from registering to vote, or currently registered individuals may cancel their voter registrations." *Id.*  And, the State claimed that limiting access helps to "ensure that only people whose tax dollars maintain the list can take advantage of its subsidized price." *Id.* at 8.

In answer to a request to identify how defendants determine what falls within the "electoral process," defendants responded that the SBE does not require an applicant to disclose his or her intended use of the List, and that the State Prosecutor's Office makes that determination. *Id.* at 9-10.  Defendants also noted that the SBE occasionally consults "publicly available sources to learn information about organizations" that apply for the List, when the "identity of the organization" requesting the List "may raise questions as to the permissibility of the intended use." *Id.* at 10-11.  Defendants gave the example of a branded consumer products company requesting a copy of the List. *Id.* at 11.  But, they note that the SBE had not to date

"contacted any applicants with questions regarding the intended use of a requested list of registered voters on account of the identity of the organization on behalf of which the list is being requested." *Id.*

Further, defendants related an incident in which a voter apparently complained to the SBE that the AARP had sent her mail after improperly using Maryland's voter data. Because the AARP receives Maryland voter data through a third-party company, the SBE conducted an investigation and concluded that "the communication at issue did not potentially involve the use of a Maryland voter list for a purpose not related to the electoral process, and may not have even involved the use of a Maryland voter list or any Maryland voter registration data at all." *Id.* Fusaro submitted documents related to this incident. ECF 53-8.

### III.

As noted, Fusaro previously sought a preliminary injunction. ECF 12. Defendants moved to dismiss the Complaint. ECF 20. By Memorandum Opinion (ECF 26) and Order (ECF 27) of September 4, 2018, I denied Fusaro's request for injunctive relief and dismissed the Complaint. I concluded that the First Amendment was not implicated because the State had no constitutional obligation to release government records. ECF 26 at 25. Moreover, the SBE rejected Fusaro's Application because he was not a Maryland resident or a Maryland voter, and not because of his political views. *Id.* at 26. Because Fusaro did not state a cognizable First Amendment claim, I did not reach his vagueness argument as to E.L. § 3-506(c). *Id.* at 3.

On appeal, the Fourth Circuit determined that Fusaro stated a cognizable First Amendment claim. *Fusaro v. Cogan*, 930 F.3d 241, 249 (4th Cir. 2019). The Court acknowledged that "there is generally no First Amendment claim based on the government's denial of access" to government records. *Id.* Indeed, the Court made clear that it "do[es] not

rule that a First Amendment right to government information exists as a general proposition." *Id.* at 255.  Rather, such a "decision [is] for the political branches." *Id.*  Moreover, the "context and nature of § 3-506 urge judicial deference to the judgment of Maryland's legislature in crafting that statute. . . ." *Id.* at 249.

The Fourth Circuit observed that the "nature of the government records to which § 3-506 governs access informs [the] analysis of the First Amendment implications." *Id.* at 251.  In this regard, it noted that Justice Scalia, in his concurrence in *Los Angeles Police Dep't v. United Reporting Publishing Corp.*, 528 U.S. 32,42 (1999), "expressly reserved the issue of whether a combination of content- and speaker- based conditions on access to government information could constitute a speech restriction subject to First Amendment scrutiny." *Fusaro*, 930 F.3d at 252.  But, the Court reasoned that E.L. § 3-506 implicates the First Amendment because the List is "closely tied to political speech, which generally receives the strongest First Amendment protection." *Fusaro*, 930 F.3d at 250.  And, the provision "imposes content- and speaker-based conditions on access to and use of the List, and such restrictions are typically subject to heightened scrutiny." *Id.*  Thus, the Court determined that the "conditions that § 3-506 imposes with respect to the List present a sufficient risk of improper government interference with political speech that it is susceptible to being challenged under the Free Speech Clause." *Id.*

According to the Fourth Circuit, the information Fusaro seeks has a "direct relationship to political speech" through its "explicit connection to the 'electoral process.'" *Id.* at 251 (quoting E.L. § 3-506(a)(1)(ii)(2)).  That the List is "publicly available" reflects "the common use of such voter data by political groups, advocacy organizations, and other seeking to spread messages or garner support for candidates or causes." *Id.*  Section 3-506 "all but ensures that the List will be used to further" political expression.  *Id.*  Thus, the Fourth Circuit was "obliged to hesitate before

placing such a regulation beyond judicial scrutiny." *Id.* But, it cautioned that "the First Amendment should not be stretched to cover all regulations that could conceivably affect speech at any distant point on a causal chain." *Id.* at 251-52.

The Fourth Circuit observed, *id.* at 252 (emphasis added):

> Indeed, the Supreme Court has recognized that burdening a means of communication can burden speech. The connection between "indispensable instruments of effective political speech" and speech itself led the Court to rule that campaign spending limits must satisfy strict scrutiny. *See Buckley v. Valeo*, 424 U.S. 1, 19, 23, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). *That said, access to the List presents a less immediate link to political speech than does campaign spending. And it is important that the List is a government record, so that regulations on its distribution reflect policy judgments to which courts must ordinarily defer. In other words, requesting and obtaining a copy of the List is not purely an act of speech*, in that it is not simply a matter of personal expression, nor of the use of private resources to aid such expression. But the Court's precedents favoring the protection of political speech in various forms support the conclusion that the List's connection to such speech favors some level of First Amendment protection.

The Court cautioned, *id.* at 256: "[E]ven though we have determined that the restrictions in § 3-506 implicate Fusaro's right to free speech—permitting his First Amendment challenge— we emphasize that the gravamen of his claims remains a request for government information." The release of such information, the Court stressed, "remains, fundamentally, a policy choice." *Id.* Indeed, the Court expressly "recognize[d] that content-and speaker-based conditions on accessing and using government information have not heretofore been relied on to overcome the general principle that there is no First Amendment right to such information." *Id.* at 253.[5]

The Fourth Circuit reasoned that obtaining a copy of the List is a "'step removed' from communication of political speech." *Id.* at 260 (quoting *Kendall v. Balcerzak*, 650 F.3d 515, 525

---

[5] Indeed, the Court observed that because "the government has no constitutional obligation to release information in its possession, caution is warranted in creating rules that might discourage disclosure" of such information by the government. *Id.* at 258 n.9. In other words, the price of rejecting the conditions on disclosure could lead the government to make no disclosure at all. *Id.* (citing *United Reporting*, 528 U.S. at 43-44 (Ginsburg, J., concurring)).

(4th Cir. 2011)).  Moreover, the conditions for access to the List, according to the Fourth Circuit, do "not limit speech itself."  *Fusaro*, 930 F.3d at 260.  Therefore, the Court characterized the List as "a useful tool for communication but not a form of actual speech."  *Id.*

Notably, the Court recognized that "other means of communication remain open" to Fusaro.  *Id.*  It observed that, "even absent a copy of the List, nothing prevents Fusaro from criticizing prosecutor Davitt on billboards, in newsletters, on the internet, or simply by mailing his letter to any Marylander in the phone book."  *Id.*  And, even as a non-Maryland voter, Fusaro remains free to inspect a copy of the List at "one of the twenty-four State Board offices, pursuant to the separate statutory provision in § 3-505."  *Id.* at 261.  Although visiting a local election office might present a logistical hurdle, "a state is not constitutionally required to eliminate every logistical barrier in administering its regulatory regime for elections."  *Id.*

Further, the Fourth Circuit stated: "Most importantly, the challenged provisions of § 3-506 are politically neutral, a principal factor in assessing the burden imposed by an election regulation."  *Id.*  The Court observed that "states may make certain legitimate, facially neutral distinctions between individuals seeking access to government voting data without triggering strict scrutiny. . . ."  *Id.*  It could detect "no illegitimate criteria" in "the text, context, or operation of § 3-506."  *Id.* at 262.

And, the Fourth Circuit characterized "the sole content-based distinction in § 3-506(c)" as "similarly benign."  *Id.* at 263.  The limit on use of the List for an electoral purpose "is politically neutral—that is, it does not distinguish between viewpoints, economic classes, or political affiliations . . . ."  *Id.*

In ascertaining the appropriate level of scrutiny to apply to Fusaro's claims, the Court concluded that the restrictions in E.L. § 3-506 do not "severely burden" Fusaro's rights and do

24

not "raise any suspicion of improper government action." *Id.* at 263. In the Court's view, E.L. § 3-506 "falls squarely within 'areas traditionally subject to government regulation,' which are accorded a lower level of scrutiny." *Id.* at 257 (citation omitted). Therefore, strict scrutiny is not warranted. *Id.* at 259.

Accordingly, on remand, the Fourth Circuit instructed this Court to conduct "the balancing of interests described in the *Anderson-Burdick* framework[]. . . ." *Id.*; *see Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992). This "flexible standard" is used to address First Amendment challenges to state election laws. *Fusaro*, 930 F.3d at 257. The framework "properly accommodate[s] 'the state's important regulatory interests' while vindicating individual constitutional rights" by requiring courts to "carefully balance those interests." *Id.* (quoting *Anderson*, 460 U.S. 789). The Court explained that "the close connection between voter registration and political speech may, in some contexts urge an application of strict scrutiny. But the purpose of the *Anderson-Burdick* test is to ensure that the courts carefully balance all the interests at stake, recognizing that 'there is no substitute for the hard judgments that must be made.'" *Fusaro*, 930 F.3d at 258 (quoting *Anderson*, 460 U.S. at 789).

In addition, the Fourth Circuit specifically instructed this Court to address Fusaro's vagueness challenge to the phrase "electoral process," as that term is used in E.L. § 3-506. *Fusaro*, 930 F.3d at 264.

#### IV. Legal Standard

Both sides have moved for summary judgment under Fed. R. Civ. P. 56. Under Rule 56(a), summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *see also Iraq Middle Mkt. Dev. Found. v.*

*Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law.").  To preclude the award of summary judgment, the nonmoving party must demonstrate that there are disputes of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986).

The Supreme Court has clarified that not every factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248.  There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 204 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 514 U.S. 1042 (2004); *see also Celotex*, 477 U.S. at 322–24.  Moreover, in resolving a summary judgment motion, a court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *accord Roland v. U.S. Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir.

2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013). However, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "the mere existence of a scintilla of evidence in support of the [movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [movant]." *Id.*

The judge's "function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Moreover, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

When, as here, the parties have filed cross-motions for summary judgment, the court "'consider[s] each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.'" *Def. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 392 (4th Cir. 2014) (citation omitted). In doing so, the court "'resolve[s] all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that

motion.'"  *Id.* at 393 (quoting *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003), *cert. denied*, 540 U.S. 822 (2003)); *see Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

Simply because both parties have filed for summary judgment does not mean that summary judgment to one party or another is necessarily appropriate.  Rather, "[b]oth motions must be denied if the court finds that there is a genuine issue of material fact."  10A C. Wright, A. Miller, & M. Kane, Federal Practice & Procedure § 2720 (4th ed. Suppl. 2020).

## V.  Discussion

Fusaro contends that the registered voter restriction and the electoral use restriction in E.L. § 3-506 are "abridgments of the rights to free speech, press and petition under the First Amendment. . . ."  ECF 53-1 at 2.  He also argues that the "electoral process" restriction in E.L. § 3-506(c) is unconstitutionally vague.  *Id.* at 17.

Defendants maintain that both restrictions in E.L. § 3-506 "serve important regulatory interests that easily outweigh the modest burdens on plaintiff's First Amendment rights that these restrictions impose."  ECF 56-1 at 8.  And, defendants claim that Fursaro's vagueness challenge is not ripe, but in any event that the provision is "simply not vague."  *Id.* at 9.[6]

I shall analyze the provisions in E.L. § 3-506 under the *Anderson-Burdick* framework.  I shall then turn to Fusaro's vagueness claim.

### A.  *Anderson-Burdick*

As noted, the Fourth Circuit remanded this case in order for the District Court to conduct so called *Anderson-Burdick* balancing.

---

[6] Defendants also argue that "the State Prosecutor is not a proper party to this proceeding, because he had nothing to do with (and would be powerless to remedy) the denial of plaintiff's application to the State Board for the voter list."  ECF 56-1 at 9.  In light of my disposition of the motions, I need not address this argument.

In *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983), discussing ballot access provisions, the Supreme Court recognized that "not all restrictions imposed by the States on candidates' eligibility for the ballot impose constitutionally-suspect burdens on voters' rights to associate or to choose among candidates." Further, the Court said that, "'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process.'" *Id.* (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)).

"States have enacted comprehensive and sometimes complex elections codes" in order to administer elections effectively and fairly, and "the state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions.[]" *Anderson*, 460 U.S. at 788. Therefore, challenges to election laws are resolved by balancing "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" with the "precise interests put forward by the State as justifications for the burden imposed by its rule." *Id.* at 789. The reviewing court must consider the "legitimacy and strength" of the State's interests, as well as "the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.*

Nearly a decade later, in *Burdick v. Takushi*, 504 U.S. 428 (1992), the Supreme Court considered Hawaii's prohibition on write-in ballots. The Court reiterated that laws that burden the right to vote are not automatically subject to strict scrutiny. *Id.* at 432. To do so would "tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Id.* at 433. The Court said that, under the balancing test articulated in *Anderson*, "the rigorousness of [the] inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Id.* at 434. Notably,

"when those rights are subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)).  On the other hand, "when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify the restrictions.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788).

Generally, the *Anderson-Burdick* analysis is applied with respect to laws that affect the access of candidates to the ballot, and the ability of voters to exercise their right to vote.  *See*, *e.g.*, *Crawford v. Marion Cty. Election Bd.*, 533 U.S. 181 (2008) (addressing voter photo identification requirement); *Burdick*, 504 U.S. at 434-42 (concerning prohibition on write-in ballots); *Buscemi v. Bell*, ___ F.3d ___, 2020 WL 3634740 (4th Cir. July 6, 2020).  In other words, "*Anderson*, *Burdick*, and their progeny . . . all involve direct restrictions on speech or access to the ballot." *Molinari v. Bloomberg*, 564 F.3d 587, 604-05 (2nd Cir. 2009).

In *McLaughlin v. North Carolina Bd. of Elections*, 65 F.3d 1215 (4th Cir. 1995), the Fourth Circuit recognized that restrictions on ballot access implicate "expressive rights protected by the First and Fourteenth Amendments." *Id.* at 1221.  But, "states have the power to regulate the time, place, and manner of their own elections . . . ." *Buscemi*, 2020 WL 3634740, at *6.

The *McLaughlin* Court articulated the balancing test as follows, 65 F.3d at 1221:

> In short, election laws are usually, but not always, subject to ad hoc balancing. When facing any constitutional challenge to a state's election laws, a court must first determine whether protected rights are severely burdened. If so, strict scrutiny applies. If not, the court must balance the character and magnitude of the burdens imposed against the extent to which the regulations advance the state's interests in ensuring that "order, rather than chaos, is to accompany the democratic processes." (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)).

The Fourth Circuit has also recognized the "uncontroversial proposition" that State legislatures possess "the presumptive authority to regulate elections within that state's sovereign territory." *Libertarian Party of Virginia v. Alcorn*, 826 F.3d 708, 714 (4th Cir. 2016). In cases where strict scrutiny does not apply to the challenged election regulation, it "ask[s] only that the state 'articulate[]' its asserted interests. This is not a high bar. . . ." *Id.* at 719 (quoting *Wood v. Meadows*, 207 F.3d 708, 717 (4th Cir. 2000)). But, when evaluating the burden, "however slight that burden may appear," the court must conclude that the burden is "justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford*, 553 U.S. at 191 (quoting *Norman*, 502 U.S. at 288-89).

Under *Anderson-Burdick*, "'courts consider the character and magnitude of the asserted injury'" to protected rights against "'the precise interests put forward by the State as justifications for the burden imposed . . . .'" *Marcellus*, 849 F.3d at 175 (citation omitted). An election regulation that "imposes only moderate burdens could well fail the *Anderson* balancing test when the interests that it serves are minor, notwithstanding that the regulation is rational." *McLaughlin*, 65 F.3d at 1221 n.6.

Here, the Fourth Circuit recognized that the *Anderson-Burdick* framework is generally "applied to claims concerning ballot access . . . ." *Fusaro*, 930 F.3d at 258. But, in view of "the very interests implicated by Fusaro's claim," it determined that it was appropriate to "to 'borrow' that standard for Fusaro's challenge to § 3-506." *Id.* (citing *Stuart v. Camnitz*, 774 F.3d 238, 248 (4th Cir. 2014)). As noted, the Fourth Circuit also determined that Fusaro's claims did not give rise to "severe" burdens on this First and Fourteenth Amendment rights and, as such, plaintiff's claims are not subject to strict scrutiny. *Fusaro*, 930 F.3d at 263.

### 1.  The Registered Voter Restriction

In considering the plaintiff's request for access to the List, I am mindful of *Judicial Watch v. Lamone*, 399 F. Supp. 3d 425 (D. Md. 2019), decided shortly after the Fourth Circuit's decision in the case sub judice.  In *Judicial Watch,* the plaintiff, a non-Maryland resident, sought access to the List, but it was for an electoral purpose.  To the extent that E.L. § 3-506(a) impeded access to the List by a non-Maryland voter, I concluded that Maryland law was preempted by the National Voter Registration Act of 1993 (the "NVRA"), 52 U.S.C. § 20507(i)(1), under obstacle preemption.  *Id.* at 445.  The parties have not addressed whether, given the decision in *Judicial Watch*, I need to address the constitutional argument concerning the registered voter restriction.  But, I am satisfied that, in light of *Judicial Watch*, the registered voter restriction in E.L. § 3-506(a) does not bar Fusaro from access to the List.

Under the canon of constitutional avoidance, courts "are to avoid constitutional determinations when other grounds exist for the disposition of the case."  *Snyder v. Phelps*, 580 F.3d 206, 227 (4th Cir. 2009) (Shedd, J., concurring) (citing *Ashwander v Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring)).  This doctrine "requires the federal courts to strive to avoid rendering constitutional rulings unless absolutely necessary." *Norfolk Southern Ry Co. v. City of Alexandria*, 609 F.3d 150, 157 (4th Cir. 2010) (citing *Ashwander*).

Accordingly, given that the requirement in E.L. § 3-506(a) that plaintiff be a registered Maryland voter is not a basis to deny access to Fusaro, I decline to address plaintiff's constitutional arguments with respect to his request for access to the List.

## 2. The Electoral Process Restriction

### a. *Anderson-Burdick* Balancing

In addressing the level of scrutiny that applies to Fusaro's claims, the Fourth Circuit explicitly considered the restrictions imposed by E.L. § 3-506 as a whole. As indicated, Maryland "imposes four conditions on access to a copy of the List," including that the applicant must "refrain from using the List for any purpose not related to the electoral process." *Fusaro*, 930 F.3d at 260. The Fourth Circuit considered it "important that the List is a government record . . . ." *Id.* at 252. And, as noted, it characterized the List as "a valuable tool for political speech." *Id.* at 251. Moreover, it said that "requesting and obtaining a copy of the List is not purely an act of speech . . . ." *Id.* at 252. It light of the List's "connection" to political speech, however, the Court was of the view that it "favors some level of First Amendment protection." *Id.* But, it concluded that "§ 3-506 does not merit strict scrutiny." *Id.* at 263.

Although the Fourth Circuit has already determined that the restriction in E.L. § 3-506 is not subject to strict scrutiny, *id.*, Fusaro again contends that the "electoral process" restriction is a content-based restriction on speech that implicates strict scrutiny. ECF 53-1 at 14-16. He posits that the burden imposed by E.L. § 3-506 is "serious." ECF 53-1 at 11.

The crux of Fusaro's argument is that the List is a valuable resource: it is inexpensive and it contains contact information for persons he wishes to reach, *i.e.*, Maryland registered voters. The information contained in the List is publicly available. *Id.* at 16. And, Fusaro complains that Maryland voters may obtain it at a price that is more favorable than what Fusaro would have to pay to obtain similar information from a third-party vendor. *Id.* at 11. In his view, Maryland's asserted interests in protecting voter privacy, encouraging voter registration, and subsidizing production of the List for taxpayers who fund the maintenance of the List are

"legally dubious," "conclusory," and "contradicted by evidence." *Id.* at 11-12; *see id.* at 16. Fusaro asserts: "Encouraging Marylanders to register to vote or maintain their voter registration is laudable, but may be accomplished in any number of ways without censorship." *Id.* at 16.

Fusaro acknowledges that he does not intend to contact every registered voter on the List, as he only wishes to spend a few hundred dollars to send his Updated Letter. *See* ECF 58 at 25. Nor has he articulated a coherent plan for how he will select the particular voters to whom to mail his Updated Letter, because he "hadn't gotten that far." *Id.* at 24. And, he has not considered any of the various alternative means of communication available to him (*id.* at 27-29) to reach Maryland voters. *See, e.g.*, *id.* at 37.

The State counters that the electoral process restriction is necessary "so that those who chose to register to vote will not, by doing so, potentially become inundated with non-electoral-process-related-communication through broad access to Maryland's voter list." ECF 56-1 at 25. According to defendants, the List is a "uniquely cheap and powerful tool." *Id.* Therefore, it is "subject to exploitation in a way that individual voter registration records (such as voter registration applications) available through local board offices are not." *Id.* at 25-26.

Defendants maintain that the statutory provision implicates the State's important interest in encouraging voter participation. *Id.* at 25. In the State's view, protecting registered voters from commercial solicitation and other exposure unrelated to the electoral process fosters Maryland's objective in quelling voter concerns about disclosure of their names and addresses as the price for their participation in the democratic process. *Id.*[7]

---

[7] In addition, the State claims that the "registered voter and electoral process restrictions work together" to advance its interest in encouraging voter registration and participation. ECF 56-1 at 27. In its view, the electoral process restriction would be "difficult for the State to enforce if persons residing outside of Maryland were permitted to obtain access to the list." *Id.* Thus, the registered voter restriction "facilitates enforcement of the 'electoral process'

In my view, the List is not essential for plaintiff to achieve the desired objective of direct mail to registered Maryland voters. It may be the most efficient and the least costly means. But, as the Fourth Circuit observed, even if the State does not provide plaintiff with a copy of the List, the same information could be garnered from requests to local election boards. *Fusaro*, 930 F.3d at 260. Indeed, Fusaro is entitled to inspect the voter lists at every local office, at no cost.

To be sure, Fusaro must physically travel to do so. But, as the Fourth Circuit has noted, the "state is not constitutionally required to eliminate every logistical barrier in administering its regulatory regime for elections." *Id.* at 261 (citing *Burdick*, 504 U.S. at 433). Moreover, as the Fourth Circuit has recognized, "nothing prevents Fusaro from criticizing prosecutor Davitt on billboards, in newsletters, on the internet, or simply by mailing his letter to any Marylander in the phone book." *Fusaro*, 930 F.3d at 260; *see Miller v. Brown*, 503 F.3d 360, 368 (4th Cir. 2007) (holding that First Amendment associational rights are not burdened where Virginia provided "multiple options" for political parties to vindicate those rights). Therefore, the burden on Fusaro is not particularly significant.

I turn to defendants' asserted interests in limiting use of the List. Maryland unquestionably has an interest in encouraging voter registration and participation in the electoral process. *See, e.g.*, *Van Allen v. Cuomo*, 621 F.3d 244, 249 (2d Cir. 2010) (observing that "the state has a legitimate interest in encouraging new voter registration"). Defendants have determined that the electoral process restriction in E.L § 3-506 furthers this interest, in that it limits the possibility that, as a result of registration, voters will become "inundated" with communications unrelated to elections. *See* ECF 56-1 at 25. Although much of the information

---

restriction, which in turn protects the privacy of Maryland voters and promotes voter registration more generally." *Id.* at 28. Because the registered voter requirement is preempted under the NVRA, I will consider the electoral process restriction standing on its own.

available on the List can be obtained by the public from other sources, the List is a "uniquely cheap and powerful tool" because it compiles voter contact information in one place. *Id.* Maryland has determined that to protect the List from abuse, the appropriate balance is to limit the distribution of the List to those who certify that they do not intend to use the List for non-electoral purposes. *Id.* at 26. *See Rhode Island Ass'n of Realtors, Inc. v. Whitehouse*, 51 F. Supp. 2d 107, 113 (D. R.I. June 9, 1999) (asserting that "Rhode Island clearly has a legitimate and substantial interest in protecting the privacy rights of its citizens by establishing appropriate limitations on access to and/or the use of personal information that citizens are compelled to furnish to governmental agencies.").

The State's desire to promote voter registration while minimizing abuse of the List is furthered by limiting use of the List to electoral purposes. Use of the List is permitted for any electoral purpose, without regard to the message. Conversely, no use of the List is allowed, regardless of the message, if it is unrelated to the electoral process. The State has determined that its citizens should not face an onslaught of communication or solicitations irrelevant to the electoral process as the price of participation in the electoral process. It is both reasoned and credible that Maryland would impose a modest burden in order to advance the interest it has identified. *See Libertarian Party of Va.*, 826 F.3d at 719.

Accordingly, I conclude that the State has met its burden in justifying the burden the electoral process restriction places on Fusaro's ability to access the List, both facially and as-applied.

### b.  Vagueness

Fusaro contends that the proscription in E.L. § 3-506(c), barring use of the List for a purpose "not related to the electoral process," is "void for vagueness."  ECF 53-1 at 17.  The State contends that the issue is neither ripe nor meritorious.

### i.  Ripeness

As a threshold matter, defendants provide this Court with multiple roadmaps to avoid reaching the merits of Fusaro's claim that "electoral process" is unconstitutionally vague.  They maintain that Fusaro's vagueness challenge is not ripe, in that Fusaro was not denied access to the List "because of the *purpose* for which he requested it."  ECF 56-1 at 34 (emphasis in brief). Moreover, the State argues that Fusaro does not "reasonably face 'actual or threatened action' resulting from his use of a list acquired from third parties. . . because plaintiff has expressly disclaimed any desire to do so."  *Id.*

Alternatively, defendants contend that the Court should not decide the issue because upholding the voter registration restriction will foreclose Fusaro's access to the List.  *Id.*   But, as noted, I previously concluded that the registered voter provision is preempted under the NVRA, based on obstacle preemption.  *See Judicial Watch*, 399 F. Supp. 3d at 442-45.  Therefore, the voter registration restriction does not foreclose Fusaro's access to the List.   And, I have concluded that the electoral process restriction passes constitutional muster under *Anderson-Burdick* balancing.

Fusaro insists that the vagueness challenge is ripe.   ECF 59 at 5.   Although he acknowledges that there is no "history of prosecution" with regard to the "electoral process" restriction, *id.*, he maintains that "ripeness requirements are relaxed in First Amendment cases given the 'potential chilling effects of unconstitutional restrictions on free speech.'"  *Id.* at 4

(quoting *Pearson v. Leavitt*, 189 F.App'x 161, 163 (4th Cir. 2006)).  Moreover, he contends that he has disclaimed the desire to access the List from a third party because of the chill from the required oath.  ECF 59 at 4.

Defendants have not framed their contention as an Article III standing argument, but the "'case or controversy' constraint of Article III" includes principles of standing as well as ripeness, which "presents a 'threshold question [ ] of justiciability.'" *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 269 (4th Cir. 2013) (citation omitted).  Like standing, ripeness is an issue of subject matter jurisdiction.  *Sansotta v. Town of Nags Head*, 724 F.3d 533, 548 (4th Cir. 2013); *see Nat'l Ass'n for the Advancement of Colored People v. Bureau of the Census*, 382 F. Supp. 3d 349, 363 (D. Md. 2019) ("NAACP") (describing standing and ripeness as "overlapping facets" of subject matter jurisdiction).

As with standing, the ripeness doctrine is "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction . . . ." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (internal quotation marks omitted).  Whereas standing focuses on who can sue, ripeness "'concerns the appropriate timing of judicial intervention.'"  *Cooksey v. Futrell*, 721 F.3d 226, 240 (4th Cir. 2013) (quoting *Va. Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 389 (4th Cir. 2001)); *see NAACP*, 382 F. Supp. 3d at 363 (noting that standing concerns who may sue, while ripeness pertains to when a party may sue).

Notably, a claim is not ripe for judicial review "'if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Scoggins*, 718 F.3d at 270 (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).  In other words, "the ripeness requirement is designed 'to prevent the courts, through avoidance of premature adjudication,

from entangling themselves in abstract disagreements' . . . ." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 732-33 (1998) (citations omitted); *see also South Carolina v. United States*, 912 F.3d 720, 730 (4th Cir. 2019); *NAACP*, 382 F. Supp. 3d at 370.

The doctrines of ripeness and standing have largely blurred in declaratory judgment actions. *See* 13B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 3532.5 (3d ed. 2018). In *MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118 (2007), the Supreme Court recognized that "standing and ripeness boil down to the same question" of justiciability. *Id.* at 128 n.8; *accord Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5 (2014); *see South Carolina*, 912 F.3d at 730; *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006); *see also Capital Associated Indus., Inc. v. Stein*, 283 F. Supp. 3d 374, 380 (M.D.N.C. 2017) (characterizing discussion of standing and ripeness as "one involving 'standing'" in light of *MedImmune* and *Susan B. Anthony List*).

Both ripeness and standing "require that those seeking a court's intervention face some actual or threatened injury to establish a case or controversy." *Doe v. Duling*, 782 F.2d 1202, 106 n.2 (4th Cir. 1986). And, "a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Susan B. Anthony List*, 573 U.S. at 159 (quoting *Babbitt v. Farm Workers*, 422 U.S. 289, 298 (1979)). Of relevance here, a plaintiff is "not required to expose himself to liability before bringing suit to challenge the basis for the threat" to a constitutional right. *MedImmune,* 549 U.S. at 128-29.

The requirements for ripeness, like those for standing, are "relaxed in First Amendment cases." *Cooksey*, 721 F.3d at 240. "'In a wide variety of settings, courts have found First

Amendment claims ripe, often commenting directly on the special need to protect against any inhibiting chill.'" *Id.* (quoting *Bill Richardson v. Gonzales*, 64 F.3d 1495, 1500 (10th Cir. 1995)).

The electoral process restriction is, as the Fourth Circuit has noted, a content-based restriction, in that it facially restricts the use of the List to the electoral process. *Fusaro*, 930 F.3d at 263. And, the provision could "chill the exercise of First Amendment rights," in that it could be used to prosecute Fusaro if he used the List to disseminate the Updated Letter, which he concedes is a non-electoral purpose. *See North Carolina Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710 (4th Cir. 1999).

"Prior enforcement of the challenged statute is '[t]he most obvious way to demonstrate a credible threat of enforcement in the future.'" *Buscemi*, 2020 WL 3634740, at *3 (quoting *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018)). Indeed, "a credible threat of enforcement is critical" to establish an injury in fact for purposes of standing. *Abbott*, 900 F.3d at 176; *see also Curtis v. Propel Prop. Tax Funding, LLC*, 915 F.3d 234, 241 (4th Cir. 2019) (stating that a plaintiff challenging the constitutionality of a statute must show a "'realistic danger'" of a "'direct injury'") (citation omitted). Here, the State Prosecutor has not stated whether he would prosecute Fusaro for his use of the List to disseminate his Updated Letter. ECF 53-10 at 12.

To be sure, defendants point out that since January 2010, the State Prosecutor has not prosecuted anyone who "knowingly allows a list of registered voters, under the person's control, to be used for any purpose not related to the electoral process"; the State Prosecutor is also unaware "of any prosecution of this statute or its predecessors prior to that date." ECF 56-1 at 18. However, given that the State Prosecutor has not ruled out prosecution under a law currently on the books, this rises to a credible threat of enforcement.

In any event, I need not resolve the issue. This is because the Fourth Circuit has expressly instructed me to address the merits of the vagueness issue. *Fusaro*, 930 F.3d at 264.

### ii.      Principles of Statutory Construction[8]

The Fourth Circuit has instructed that, when interpreting a state statute, a federal court should "apply the statutory construction rules applied by the state's highest court." *In re DNA Ex Post Facto Issues*, 561 F.3d 294, 300 (4th Cir. 2009); *see Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am., Inc.*, 492 F.3d 484, 489 (4th Cir. 2007). Maryland "follows the general principles of statutory interpretation." *Johnson v. Mayor & City Council of Balt.*, 430 Md. 368, 377, 61 A.3d 33, 38 (2013).

In general, the task of interpreting a statute begins with the text. *Bostock v. Clayton County*, ___ U.S. ___ 140 S. Ct. 1731, 1749 (2020) ("This Court has explained many times over many years that, when the meaning of the statute's term is plain, our job is at an end."); *Murphy v. Smith*, __ U.S. ___, 138 S. Ct. 784, 787 (2018) ("As always, we start with the specific statutory language in dispute."); *accord United States v. Bryant*, 949 F.3d 168, 174 (4th Cir. 2020). To ascertain a statute's meaning, "'the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *Gundy v. United States*, ___ U.S. ___, 139 S. Ct. 2116, 2126 (2019) (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007)). Courts may also consider a statute's history and purpose to give effect to its language. *See Gundy*, 139 S. Ct. at 2126. However, courts may "not resort to legislative history to cloud a statutory text that is clear." *Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994); *see Raplee v. United States*, 842 F.3d 328, 332 (4th Cir. 2016) ("If the meaning of the text is plain . . . that meaning controls.").

---

[8] The parties do not specifically brief statutory construction, but the principles are relevant to the analysis that follows.

In Maryland, the "'cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the General Assembly.'" *Conaway v. State*, 464 Md. 505, 523, 212 A.3d 348, 358 (2017) (citation omitted); *see Deville v. State*, 383 Md. 217, 223, 858 A.2d 484, 487 (2004). To that end, the Maryland Court of Appeals follows a two-step approach. *See Johnson*, 430 Md. at 377-78, 61 A.3d at 38. Courts first examine "'the plain meaning of the statutory language[.]'" *Id.* at 377, 61 A.3d at 38 (citation omitted). If the language "'is clear and unambiguous, and consistent with both the broad purposes of the legislation, and the specific purpose of the provision being interpreted, [the] inquiry is at an end.'" *Id.* (citation omitted). However, if the statute's "'language is ambiguous or unclear, [courts] seek to discern the intent of the legislature from surrounding circumstances, such as legislative history, prior case law, and the purposes upon which the statutory framework was based.'" *Id.* (citation omitted).

At the first step, courts "'do not read statutory language in a vacuum,'" nor do they "'confine [their] interpretation of a statute's plain language to the isolated section alone.'" *Williams v. Peninsula Reg'l Med. Ctr.*, 440 Md. 573, 580-81, 103 A.3d 658, 663 (2014) (citation omitted); *see Gundy*, 139 S. Ct. at 2126; *Bryant*, 949 F.3d at 175. Rather, the statutory language "'must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute.'" *In re J.C.N.*, 460 Md. 371, 391, 190 A.3d 329, 341 (2018) (citation omitted). And, a court should strive to "avoid a construction of the statute that is unreasonable, illogical, or inconsistent with common sense." *Bellard v.* State, 452 Md. 467, 481-82, 157 A.3d 272, 280-81 (2017).

Moreover, the statute must be read "'as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory.'" *Conaway*, 464 Md. at 523, 212 A.3d at 358; *see Bourgeois v. Live Nation Ent's, Inc.*, 430 Md. 14, 27, 59 A.3d 509, 516

(2013).  As the Maryland Court of Appeals has explained, courts may "'neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute.'"  *McCloud v. Dep't of State Police, Handgun Permit Review Bd.*, 426 Md. 473, 480, 44 A.3d 993, 997 (2012) (citation omitted).

Of import here, terms that are not defined are "'interpreted as taking their ordinary, contemporary, common meaning.'"  *Sandifer v. U.S. Steel Corp*., 571 U.S. 220, 227 (2014) (citation omitted); *accord United States v. George*, 946 F.3d 643, 645 (4th Cir. 2020).  Words in a statute are assigned their "ordinary meaning."  *Balt. City Det. Ctr. v. Foy*, 461 Md. 627, 645, 197 A.3d 1, 11 (2018).  Dictionary definitions may provide a "'useful starting point'" to determine a term's meaning in common parlance.  *Montgomery Cty. v. Deibler*, 423 Md. 54, 67, 21 A.3d 191, 198 (2011) (citation omitted); *see also Foy*, 461 Md. at 645, 197 A.3d at 11; *Bottini v. Dep't of Fin*., 450 Md. 177, 195, 147 A.3d 371, 382 (2016) (using dictionary definition to construe the meaning of the term "money" in a statute).  However, dictionary definitions are not necessarily dispositive.  *Deibler*, 423 Md. at 67, 31 A.3d at 198.  And, when a court turns to a dictionary to clarify a statutory term, the court should endeavor to consult an edition that was extant at the time that the challenged statute was enacted.  *Harvey v. Marshall*, 389 Md. 243, 260 n.11, 884 A.2d 1171, 1181 n.11 (2005).

### iii. Analysis

For starters, Fusaro concedes that he does not intend to use the List for an electoral purpose.  As defendants point out, Fusaro states in his Complaint that "the letter he wishes to send 'literally cannot . . . be reasonably interpreted to relate to elections or to the electoral process.'"  ECF 56-1 at 36 (citing ECF 1, ¶ 35).

43

Because the State Prosecutor has "declined to provide any detail whatsoever as to what 'electoral process' means, or whether Fusaro's letters fit the bill," Fusaro contends that he "still does not know what is prohibited by the law and what is not." *Id.* He argues that the provision is vague because the determination of whether the Updated Letter violates E.L. § 3-506 depends on "'numerous other factors not addressed by the abstract hypothetical presented in this request.'" *Id.* at 18 (quoting ECF 53-10 at 12).

Fusaro also incorporates by reference his arguments concerning vagueness in earlier briefing. ECF 53-1 at 18. In those submissions, Fusaro contends that courts have struck down terms such as "political purposes," and "political activity." ECF 17-1 at 10. He notes that Black's Law Dictionary defines "electoral process" as "'1. The method by which a person is elected to public office in a democratic society. 2. The taking and counting of votes." Electoral process, BLACK'S LAW DICTIONARY (9th ed. 2009).'" *Id.* But, he contends that this does not provide adequate notice of what is proscribed. *Id.* at 11. This lack of notice, he contends, "promises arbitrary and discriminatory enforcement." *Id.* And, he argues that "electoral process" provides no guidance as to what policy issues may be permissible topics. ECF 21 at 16-17.

Moreover, Fusaro asserts that third parties who might provide Fusaro with a copy of the List are "jeopardized" and potentially subject to criminal liability because it is unclear what "electoral process" means. ECF 53-1 at 19-20. Plaintiff contends that the restrictions on access and the vagueness issue cannot be "compartmentalized," *id.* at 20, and he fears prosecution of himself and of any third party who furnishes him a list due to the purported vagueness issue. *Id.* at 20-21. And, Fusaro points to the SBE's prior history of monitoring use of the List, as discussed in the context of the AARP, as evidence that the SBE does not utilize a consistent

definition of "electoral process," raising the specter of viewpoint or speaker-based discrimination.  ECF 59 at 15.

According to defendants, plaintiff "admits that he is able to understand the scope of § 3-506.  Indeed, according to defendants, plaintiff deliberately seeks to avoid any activity that could be characterized as related to the 'electoral process.'"  ECF 56-1 at 36.  And, defendants argue that the meaning of "electoral process" is not unconstitutionally vague when the provision is read within the context of Maryland's election code and using "ordinary meaning and common sense."  *Id.* at 38.  That the State Prosecutor "has not committed (one way or the other) to prosecuting plaintiff in the event that plaintiff were to send his letter with the aid of a voter list he receives from the State. . . does not somehow undermine this conclusion," according to defendants.  *Id.* at 39-40.  Prosecutorial discretion, they say, is not sufficient to render the provision unconstitutionally vague.  *Id.* at 40.

The Fourth Circuit has said that a statute is "unconstitutionally vague under the Due Process Clause if it 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *Martin v. Lloyd*, 700 F.3d 132, 135 (4th Cir. 2012) (quoting *United States v. Williams*, 554 U.S. 285, 304 (2008)).  As the Supreme Court has explained, "the void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  Although the void-for-vagueness doctrine is "an outgrowth not of the First Amendment, but of

the Due Process Clause of the Fifth Amendment," it has broader application "in the First Amendment context," where its requirements are "relaxed." *Williams*, 554 U.S. at 304.

The Fourth Circuit's analysis of the constitutional vagueness of North Carolina's campaign finance regulations in *North Carolina Right to Life, Inc. v. Leake*, 525 F.3d 274 (4th Cir. 2008), is instructive. In *Leake*, anti-abortion advocacy entities brought a First Amendment challenge to various provisions of North Carolina's campaign finance law.[9] One of the challenged provisions was N.C. Gen. Stat. § 163-278.14A(a), which provided, in relevant part:

> (a) Either of the following shall be means, but not necessarily the exclusive or conclusive means, of proving that an individual or other entity acted "to support or oppose the nomination or election of one or more clearly identified candidates":
>
>> (1) Evidence of financial sponsorship of communications to the general public that use phrases such as "vote for", "reelect", "support", "cast your ballot for", "(name of candidate) for (name of office)", "(name of candidate) in (year)", "vote against", "defeat", "reject", "vote pro-(policy position)" or "vote anti-(policy position)" accompanied by a list of candidates clearly labeled "pro-(policy position)" or "anti-(policy position)", or communications of campaign words or slogans, such as posters, bumper stickers, advertisements, etc., which say "(name of candidate)'s the One", "(name of candidate) '98", "(name of candidate)!", or the names of two candidates joined by a hyphen or slash.
>
>> (2) Evidence of financial sponsorship of communications whose essential nature expresses electoral advocacy to the general public and goes beyond a mere discussion of public issues in that they direct voters to take some action to nominate, elect, or defeat a candidate in an election. If the course of action is unclear, contextual factors such as the language of the communication as a whole, the timing of the communication in relation to events of the day, the distribution of the communication to a significant number of registered voters for that candidate's election, and the cost of the communication may be considered in determining whether the action urged could only be interpreted by a reasonable person as advocating the nomination, election, or defeat of that candidate in that election.

---

[9] The United States District Court for the Eastern District of North Carolina initially invalidated certain provisions. 2001 WL 37126580 (E.D. N.C. Oct. 24, 2001). The Fourth Circuit affirmed, in part, 344 F.3d 418 (4th Cir. 2003), but the Supreme Court vacated and remanded, 541 U.S. 1007 (2004).

The plaintiffs alleged, *inter alia*, that this law "unconstitutionally restricted issue advocacy in prescribing a standard that, through context, attempts to determine if a communication supports or opposes the nomination or election of a particular candidate . . . ." *Leake*, 525 F.3d at 278.

As the Fourth Circuit characterized it, § 163-278.14A thus provided two routes for determining whether "an individual acted to support or oppose the nomination or election of one or more clearly identified candidates." *Id.* at 280 (citation omitted).  The first prong "classifies communications as supporting or opposing a clearly identified candidate when they explicitly use" election-related phrases, such as "vote for" or "reelect" or "support" in conjunction with a candidate's name.  *Id.*  The second prong assesses the "essential nature" of communications that do not use these express election-related terms.  *Id.*

If it was "unclear" whether the "essential nature" or a communication "goes beyond a mere discussion of public issues in that [it] direct[s] voters to take some action to nominate, elect, or defeat a candidate in an election," *id.* (citation omitted) (alterations in *Leake*), then regulators were tasked with considering, *id.* at 281,

> contextual factors such as the language of the communication as a whole, the timing of the communication in relation to events of the day, the distribution of the communication to a significant number of registered voters for that candidate's election, and the cost of the communication ... in determining whether the action urged could only be interpreted by a reasonable person as advocating the nomination, election, or defeat of that candidate in that election.

The Fourth Circuit determined that this second prong was unconstitutionally vague, because it "'unquestionably chill[s] a substantial amount of political speech.'"  *Id.* at 285.  It reasoned that the statute's "open-ended terms provide little *ex ante* notice to political speakers as to whether their speech will be regulated.  Instead, speakers are left to guess and wonder whether

a regulator, applying supple and flexible criteria, will make a post hoc determination that their speech is regulable as political advocacy." *Id.* at 284.  Among the concerns posed by North Carolina's regulation was the "unguided discretion given to the State to decide when it will move against political speech and when it will not." *Id.* at 385.

Maryland's electoral process restriction does not suffer from these infirmities.  To be sure, the term "electoral process" is not defined in the statute.  But, there is no amorphous factor-based test that could be interpreted in ways that raise concerns of viewpoint discrimination.  Courts do not declare a statute vague "simply because it does not include the most elaborate or the most specific definitions possible." *United States v. Schrad*er, 675 F.3d 300, 310 (4th Cir. 2012).

Here, a "common sense reading of the statute adequately defines the prohibited conduct." *Id.*  The term "electoral" has plain meaning. Merriam Webster defines "electoral" as "of or relating to an election." *See* https://bit.ly/2VxZzki.  And, as Fusaro notes, Black's Law Dictionary provides the following definition: "1. The method by which a person is elected to public office in a democratic society. 2. The taking and counting of votes." Electoral process, BLACK'S LAW DICTIONARY (11th ed. 2019). *See* ECF 17-1 at 10.  Unlike the term "political," which has a wider sweep, the term "electoral" has a narrower, more concrete meaning.

A person seeking to utilize the List is not tasked with divining the number of voters who may be contacted or the topics permissible under this restriction.  Rather, he or she must only determine whether the use of the List relates to the "electoral process."  As defendants point out, the term "electoral process" appears in Maryland's election code four times: authorizing the governor to postpone an election or specify alternative voting locations in the event of an emergency that interferes with the "electoral process" (E.L. § 8-103(a)); directing courts in

certain circumstances to grant relief to ensure the integrity of the "electoral process" (E.L. § 6-209(a)(2); stating that the "electoral process" for primary elections shall be uniform (E.L. § 8-101(b); and directing the SBE to make information concerning the "electoral process" available to the general public (E.L. § 2-102(b)(9)).  The plain meaning of the term "electoral process," along with its inclusion in various places in Maryland's election code, indicates that it pertains to the process of conducting elections.  *See Shrader*, 675 F.3d at 310-11 (noting that a term in a statute can be "adequately defined 'by reference to judicial decisions, common law, dictionaries, and the words themselves because they possess a common and generally accepted meaning.'" (quoting *United States v. Bowker*, 372 F.3d 365, 380-82 (6th Cir. 2004), *rev'd on other grounds*, 543 U.S. 1182 (2005)).

The fact that a restriction requires some interpretation from courts and enforcement agencies does not make the restriction unconstitutionally vague.  DeMarinis, who is not employed by the Office of the State Prosecutor, could not necessarily provide a clear answer to whether Fusaro's letters hypothetically fall within the "electoral process."  But, this does not mean the requirement is unconstitutionally vague.  *Capital Associated Indus., Inc. v. Stein*, 922 F.3d 198, 211 (4th Cir. 2019) ("[F]air notice doesn't require certainty about every hypothetical situation.").  And, despite the fact that Fusaro avers that he does "not understand what is authorized or prohibited by the term 'related to the electoral process'" (ECF 53-12, ¶ 2), Fusaro's suit is based on the uncontested premise that his Letter and Updated Letter criticizing an appointed official do not fall within the ambit of "electoral process."  *See* ECF 1, ¶ 20 ("Davitt is not an elected official, the mailer does not advocate for the election or defeat of a candidate or ballot measure[] or mention a candidate for office or ballot measure."); *id.* ¶ 22 ("In the future, Fusaro would send other letters and non-commercial materials that relate to issues of local and

national political importance, but not the electoral process."); *id.* ¶ 26 ("Fusaro will refrain from sending his letter and many future communications, because they are not related to the electoral process . . ."); *id.* ¶ 35 ("Davitt is an appointed official, thus Fusaro's letter does not—and literally cannot—call for Davitt's election or defeat or be reasonably interpreted to relate to elections or the electoral process.").  Fusaro is simply not lost at sea here.

The SBE's exchange with the AARP does not support plaintiff's contention that the SBE lacks a coherent definition of "electoral process."  Plaintiff contends that the SBE was alerted to the AARP's potential use of voter data to send out a letter "focusing on the budget of a president who is no longer eligible for re-election. . . ."  ECF 59 at 15.  According to plaintiff, the SBE "elected not to further investigate or refer any type of enforcement" regarding this use of voter data and concluded it was "related to the electoral process."  *Id.*  He objects to the fact that now, defendants appear to be inconsistently arguing that the AARP's letter (like Fusaro's letters) was *not* related to the electoral process.  *Id.*  He contends that the reason for this apparent switch might be viewpoint discrimination.  *Id.*

However, the letters plaintiff himself attached to his summary judgment motion expressly state that, in response to the SBE's inquiry into possible misuse of voter data, the AARP determined that it had not even sent any mail to the particular voter who complained.  ECF 53-8 at 3.  The lack of enforcement referral on the part of the SBE was not because it concluded that the AARP's letter had been related to the electoral process.  Rather, it was because the AARP had concluded that it *had not sent the voter any mail at all*.  There is no basis to conclude that the SBE is engaging in speaker-based or viewpoint-based discrimination in its application of the electoral process restriction.

Similarly, Fusaro has not succeeded in demonstrating a risk of arbitrary or discriminatory enforcement by the State Prosecutor, because he has not demonstrated any history of enforcement at all.  Fusaro might wish for additional guidance from the State.  Such desire does not render a statute void for vagueness.  Accordingly, I conclude that Fusaro's vagueness challenge to E.L. § 3-506 must fail as applied to Fusaro.  His facial vagueness challenge must also fail: a law cannot be facially vague simply "because it is unclear in some of its applications. . . ."  *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982).  And, a "'plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'"  *Holder v. Humanitarian Law Project*, 561 U.S. 1, 20 (2010) (quoting *Hoffman Estates*, 455 U.S. at 495).

## VI.  Conclusion

For the foregoing reasons, I shall grant the Supplemental Complaint Motion.  I shall grant the State Motion.  And, I shall deny the Fusaro Motion.

An Order follows.

Date:  July 14, 2020

_____/s/_____
Ellen Lipton Hollander
United States District Judge